STATE OF CONNECTICUT *v.* ROBERT WILLIAMSON
(4763)

DUPONT, C. J., BORDEN and SPALLONE, Js.

Argued December 4, 1986—decision released April 21, 1987

*Steven M. Sellers,* deputy assistant state's attorney, with whom, on the brief, was *John Waddock,* assistant state's attorney, for the appellant (state).

*John J. Buckley,* for the appellee (defendant).

SPALLONE, J. The state, with permission of the trial court pursuant to General Statutes § 54-96, is appealing from a judgment dismissing with prejudice an information charging the defendant with possession of narcotics in violation of General Statutes § 21a-279 (a), possession of cocaine with intent to sell in violation of General Statutes § 21a-277 (a), possession of marihuana in violation of General Statutes § 21a-279c, possession of drug paraphernalia in violation of General Statutes § 21a-267 (b), carrying a dangerous weapon in violation of General Statutes § 53-206, carrying a pistol without a permit in violation of General Statutes

§ 29-35, and interfering with a police officer in violation of General Statutes § 53a-167a. The state had moved for dismissal with prejudice after the trial court had granted the defendant's motion to suppress and motion to dismiss. The state claims that the trial court erred in concluding that the state had violated the defendant's fourth amendment rights when stopping and arresting the defendant.

The trial court, after an evidentiary hearing, made the following express findings of fact. On November 10, 1984, Officer Joseph Greene of the New Haven police department was a member of the department's plain clothes street crime unit. Before this date, the police department had received complaints from merchants and citizens that, in the area of Virginia's Chicken Shack on Dixwell Avenue, individuals were loitering and dealing in drugs. Greene was aware that drug arrests had previously occurred in the same area. Greene and his colleagues had been hampered when investigating prior complaints because, even though they were not in uniform, they were readily recognized whenever they approached the site. It was common practice that, upon the officers' approach, those congregating in the area would alert others of the officers' arrival by yelling words such as "police" or "five-O." After being alerted, unidentified persons in the area of the restaurant or the cluster of small shops near it would run through the business establishments thereby eluding the investigating officers.

In order to investigate the complaints, which were general in nature, Greene met with three of his fellow officers sometime before 8 p.m. on November 10, 1984, and devised a plan to counter the alerting and fleeing activities that were frustrating their attempts to conduct a meaningful investigation. The officers decided that Greene and another officer would approach the

site in the front of the restaurant, Virginia's Chicken Shack, while the other two officers would go to the rear entrance of the restaurant.

At approximately 8 p.m., the defendant was standing in front of the restaurant with two other men. At that time, Greene, with his companion, drove his unmarked police car suddenly on to the pedestrian sidewalk directly in front of the restaurant. At the same time, the two other officers covered the back of the restaurant and proceeded to enter the rear door of the establishment. As he stopped his car, Greene observed the defendant and his two male companions standing in front of the restaurant. There was nothing to indicate at that time that the defendant and his companions were engaging in any illegal behavior. Greene, after he had exited his vehicle, heard someone in the immediate area yell "police" or some such word of alert. The defendant and his two companions ran into the restaurant with Greene in pursuit, calling upon the defendant to halt and indicating that he was a police officer.

While in pursuit, Greene observed the defendant trying to extract something from his pocket. The defendant attempted to run out the back door but was prevented from doing so by the entry of another officer through the back door, apparently with his gun drawn. The defendant then followed one of his companions into a bathroom. Greene was immediately behind the defendant and observed him trying to drop something from his person. The officer heard the sounds of two items being dropped, one making a soft sound and the other a hard sound. Greene then apprehended the defendant, removed him from the bathroom into the restaurant, and patted him down. Another officer retrieved a package of cocaine and a pistol from the bathroom floor in the area where the defendant was restrained. Greene then placed the defendant under

arrest and, while searching him incidental to the arrest, found a quantity of marihuana on the defendant's person.

Upon these facts, the trial court concluded that Greene had insufficient information to satisfy the "reasonable and articulable suspicion" standard of *Terry v. Ohio,* 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), and its progeny when the officer pursued the defendant. The court characterized the police operation as a "sting" that was "designed something like a writ of assistance to stop anyone in the area of the Chicken Shack whom the officer surmised would aid in the investigation of the complaints the department received." The court found that the plan, as applied to the defendant, was illegal under the fourth amendment, and that the defendant's flight "was impelled by the officer's own illegal conduct of the sting." The court did not find that the defendant's flight betrayed a consciousness of guilt, observing that "many citizens would want to flee or avoid the impact of a police sting, such as the one executed here in these circumstances." The court further found that the illegal police pursuit was a substantial factor in causing the drop of the cocaine and the revolver, that the state had failed to prove that the defendant had voluntarily abandoned these items, and that the dropped items could not, therefore, be grounds for the defendant's arrest. Moreover, the court found that because the arrest was illegal, the search following the arrest was also illegal. The court, therefore, granted the defendant's motion to suppress and motion to dismiss.

In analyzing the state's claim of error, we divide our analysis into four parts: (1) whether the police operation, characterized by the trial court as a "sting," violated the defendant's fourth amendment rights; (2) whether the stop of the defendant occurred when the officer first pursued the defendant or at some point

later in the pursuit; (3) whether, at the point of the stop, the officer had "reasonable and articulable suspicion" so as to justify the detention under proper fourth amendment standards; and (4) whether, if the "stop" was constitutionally permissible, the evidence obtained therefrom established probable cause for the defendant's arrest.

In addressing these issues, our function is to determine whether the factual findings of the trial court are clearly erroneous or whether the decision is otherwise erroneous in law. Practice Book § 4061 (formerly § 3060D). The trial court's legal conclusions must stand unless they are legally and logically inconsistent with the facts; *State* v. *Torres,* 197 Conn. 620, 625, 500 A.2d 1299 (1985); or unless they are otherwise legally incorrect. Practice Book § 4061.

I

The trial court based its decision in part on the assumption that the police operation of approaching the site and covering the rear entrance of the Chicken Shack was illegal and at least tainted the subsequent stop and arrest. The court characterized the operation as a "sting" and emphasized the fact that the defendant was not an identified suspect before the operation was put into effect.[1]

---

[1] The court's memorandum of decision clearly reflects its finding that the police operation in this case was illegal. The court stated: "Here the officers preplanned a sting with no specific information upon which we could conclude that Williamson had committed or was about to commit a crime. Actually when they were planning the sting Williamson was not known to them to be in front of the restaurant.

"We find that the sting was designed something like a writ of assistance to stop anyone in the area of the Chicken Shack whom the officer surmised would aid in the investigation of the complaints his department had received. But this is the very type of government action that the Fourth Amendment was enacted to prohibit as arbitrary and unreasonable.

"When Officer Greene suddenly arrived on the scene, he momentarily viewed Williamson and his two companions standing in front of the Chicken

The court's factual and legal conclusions are erroneous. The trial court's conclusion that "the sting was designed something like a writ of assistance to stop *anyone* in the area of the Chicken Shack whom the officer surmised would aid in the investigation of the complaints" (emphasis added) is unwarranted by the court's own underlying factual findings. The officers' intent, as exhibited by their actual conduct, was to stop only those who fled through the Chicken Shack when alerted that the police approached. While "dragnet" operations involving the detention or arrest of all persons associated with or suspected of a crime violate the fourth amendment; see, e.g., *Davis* v. *Mississippi,* 394 U.S. 721, 728–29, 89 S. Ct. 1394, 22 L. Ed. 2d 676 (1969) (Harlan, J., concurring) (describing as a "dragnet procedure" the detention and fingerprinting of twenty-four Negro youths without probable cause); *Commonwealth* v. *Fogan,* 449 Pa. 552, 556, 296 A.2d 755 (1972) (members of two rival street gangs rounded up after shooting incident); nothing similar occurred in this case. Furthermore, even if the officers had intended to question others in the area, such questioning, by itself, would implicate no fourth amendment interest. *Florida* v. *Royer,* 460 U.S. 491, 497–98, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983).

In addition, the trial court's characterization of the police operation as a "sting" is an inaccurate description, and in any event does not aid in a fourth amendment analysis. The term "sting" has been used to describe operations by undercover police agents who

Shack, completely innocent conduct. Significant to us, the officer was already in the process of executing the sting with his other two brother officers preparing to enter the rear exit of the restaurant, at the very least to execute stops of the three persons.

"We think the plan as it was forcefully applied to Williamson, and Greene's subsequent actions of pursuing the defendant, were impermissible under the Fourth Amendment. Further, the defendant's very flight was impelled by the officer's own illegal conduct of the sting."

appear to operate in concert with criminals in order to identify those engaging in criminal activity. See *United States* v. *Murphy,* 768 F.2d 1518, 1528–29 (7th Cir. 1985) (judge accepting bribes from undercover agents); *United States* v. *Joyce,* 693 F.2d 838, 839 (8th Cir. 1982) ("reverse sting operation"; undercover officers pose as drug sellers actively soliciting drug transactions with dealers); *United States* v. *White,* 649 F.2d 779, 781 (10th Cir. 1981) (undercover fencing operation); *United States* v. *Taylor,* 612 F.2d 1272, 1273 (10th Cir.), cert. denied, 444 U.S. 1092, 100 S. Ct. 1060, 62 L. Ed. 2d 782 (1980) (undercover police fencing operation). Here, the police made no attempt to appear to be acting in concert with criminals. Furthermore, even in the aforementioned cases where a "sting" was involved, these courts gave no indication that such operations were illegal or violated a suspect's fourth amendment rights.[2]

The trial court erroneously concluded that the investigatory operation in this case was illegal in design. Nothing in the plan was proscribed by law or in violation of the defendant's constitutional rights.

## II

Our next task is to determine when the defendant was "seized" within the meaning of the fourth amendment. Because the information possessed by the officers increased from the time when they began their

---

[2] A constitutional issue that may arise in connection with "sting" operations is whether the government's actions reach such a level of outrage as to violate due process of law. See *United States* v. *Russell,* 411 U.S. 423, 432–33, 93 S. Ct. 1637, 1643, 36 L. Ed. 2d 366 (1973); *United States* v. *Savage,* 701 F.2d 867, 868 (11th Cir. 1983). Law enforcement techniques will be deemed unconstitutional if they violate " 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment." *United States* v. *Russell,* supra, 432 quoting *Kinsella* v. *United States ex rel. Singleton,* 361 U.S. 234, 246, 80 S. Ct. 297, 304, 4 L. Ed. 2d 268 (1960). No such claim is made here.

pursuit of the defendant until they finally detained him, it is important to determine at what stage in the pursuit the fourth amendment was implicated.

Courts have made clear that police officers do not bring about a "seizure" merely by asking questions of a citizen, even when the officer identifies himself as a police officer. *Florida* v. *Royer,* supra; *United States* v. *Woods,* 720 F.2d 1022, 1026 (9th Cir. 1983); *United States* v. *Hernandez,* 668 F.2d 824, 826–27 (5th Cir. 1982). Instead, a "seizure" occurs when "the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . . ." *Terry* v. *Ohio,* supra, 19 n.16. In *Terry* v. *Ohio,* the Supreme Court stated that the first step in evaluating the reasonableness of an investigative stop was to determine "whether the officer's action was justified *at its inception.*" (Emphasis added.) Id., 19–20; see also *United States* v. *Sharpe,* 470 U.S. 675, 682, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985); *State* v. *Aillon,* 202 Conn. 385, 399, 521 A.2d 555 (1987).

In the present case, Greene identified himself as a police officer and ordered the defendant to halt after he observed the defendant running towards the restaurant. We conclude, under the *Terry* standard, that the fourth amendment was implicated at this point. While the officer did not physically detain the defendant until after he had followed the defendant into the restaurant, observed his furtive gestures, and heard the sounds of the objects being discarded, under *Terry,* police conduct must be evaluated at its inception. Were it otherwise, the officer could use the suspicious conduct that he himself induced as evidence that the defendant was acting suspiciously. See *United States* v. *Morrison,* 546 F.2d 319, 320 (9th Cir. 1976); *Johnson* v. *United States,* 468 A.2d 1325, 1327 (D.C. App. 1983); *State* v. *Saia,* 302 So. 2d 869, 873 (La. 1974), cert.

denied, 420 U.S. 1008, 95 S. Ct. 1454, 43 L. Ed. 2d 767 (1975); *Commonwealth* v. *Thibeau,* 384 Mass. 762, 764, 429 N.E.2d 1009 (1981).

### III

We must now determine whether, when Greene identified himself as an officer and ordered the defendant to halt, he had "reasonable and articulable suspicion" to justify an investigatory stop. See *Reid* v. *Georgia,* 448 U.S. 438, 440, 100 S. Ct. 2752, 65 L. Ed. 2d 890 (1980); *State* v. *Aillon,* supra, 399; *State* v. *Aversa,* 197 Conn. 685, 690, 501 A.2d 370 (1985). It is now well established that the "reasonable suspicion" rather than the more exacting probable cause standard applies when police momentarily detain individuals for investigative purposes. *Reid* v. *Georgia,* supra; *Brown* v. *Texas,* 443 U.S. 47, 51, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979); *Terry* v. *Ohio,* supra, 20–22; *State* v. *Aversa,* supra. The test of reasonable and articulable suspicion is objective: "would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Terry* v. *Ohio,* supra 22; *State* v. *Aversa,* supra, 690–91; *State* v. *Januszewski,* 182 Conn. 142, 148, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981).

In the present case, the trial court expressly found that Greene was aware of various facts that the state asserts would satisfy the standard of "reasonable and articulable suspicion" necessary to justify a *Terry* stop. First, Greene was aware that the police had received complaints from merchants and citizens that individuals were dealing drugs in the area of the Chicken Shack. Second, Greene knew that drug related arrests had been made at that location. Third, Greene was aware that, whenever officers would approach the area,

unidentified persons would yell words such as "police" or "five-O," and that certain of the individuals would run through the local business establishments and out the rear entrances. Fourth, Greene observed that, upon his and other officers approach on the night of the incident, the defendant, after hearing someone yell "police" or some other word of alert, began running towards the Chicken Shack.

We conclude that, under these facts and the reasonable inferences therefrom, the police were justified in stopping the defendant. While the police had no more than a generalized suspicion of illegal conduct when they approached the Chicken Shack, that suspicion became specific and focused on the defendant when he ran into the restaurant in response to warnings that police had arrived. The police did nothing to force the defendant to run. But once he started to run into the restaurant, a known route for avoiding police confrontation, the defendant directed the officers' attention to himself and caused the general suspicion of illegal activity to become particularized upon himself.

The defendant argues that his flight in these circumstances was not indicative of guilt, as it could easily be interpreted as the actions of an innocent citizen seeking to remove himself from an area where an altercation, possibly a police shoot-out, might occur. This assertion betrays a misunderstanding of the concept of "reasonable and articulable suspicion." Suspicious activity, by its very nature, is equivocal and ambiguous. In *Terry*, for example, where the defendants were nervously walking back and forth in front of a store, the suspects could have been casing the store, or they "might have been window-shopping or impatiently waiting for a friend in the store." 3 W. LaFave, Search and Seizure (2d Ed. 1987) § 9.2 (c). Nonetheless, the Supreme Court held that the conduct in question justified an investigatory stop. *Terry* v. *Ohio,* supra. "The

possibility of an innocent explanation does not deprive the officer of the capacity to entertain a reasonable suspicion of criminal conduct. Indeed, the principal function of his investigation is to resolve that very ambiguity and establish whether the activity is in fact legal or illegal—to 'enable the police to quickly determine whether they should allow the suspect to go about his business or hold him to answer changes.' " *In re Tony C.,* 21 Cal. 3d 888, 894, 148 Cal. Rptr. 366, 582 P.2d 957 (1978); see also *United States* v. *Forero-Rincon,* 626 F.2d 218, 222 (2d Cir. 1980); 3 W. LaFave, supra, § 9.3 (b) nn.58 and 59.

Under the circumstances of this case, we conclude that the facts available to Greene at the time of his pursuit were sufficient to justify a *Terry* investigative stop. The trial court's conclusion to the contrary was erroneous. See also *United States* v. *Jackson,* 741 F.2d 223, 224 (8th Cir. 1984) (reasonable suspicion to stop when police drove into alley, observed two men, one of whom said, "it's the police, man, run," and the two men fled).[3]

---

[3] In determining whether the police have effected a valid investigatory stop, we examine not only the nature of police suspicions but also the degree of intrusiveness of the stop itself. See *United States* v. *Sharpe,* 470 U.S. 675, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985). This second step requires the court to determine whether the stop " ' "was reasonably related in scope to the circumstances which justified the interference in the first place." ' " Id.; *State* v. *Mitchell,* 7 Conn. App. 46, 60, 507 A.2d 1017, cert. granted, 200 Conn. 805, 512 A.2d 230 (1986). Because the court concluded that the police had insufficient grounds to stop the defendant, it did not consider this second ground. From the record before us, however, we conclude that detention was reasonable in scope. The detention occurred immediately after the police had a reasonable, articulable suspicion of criminal activity. These suspicions were heightened by the conduct of the defendant after Greene began his pursuit. The defendant was detained only for two to three minutes while the police pursued their investigation to confirm or dispel their suspicions. The limited patdown search of the defendant was justified as a limited search for weapons. *Ybarra* v. *Illinois,* 444 U.S. 85, 93, 100 S. Ct. 338, 62 L. Ed. 2d 238 (1979), reh. denied, 444 U.S. 1049, 100 S. Ct. 741, 62 L. Ed. 2d 737 (1980). We note that the officer did not search the defendant's pockets at this time and did not dis-

## IV

Because we have held that the police were justified in stopping and detaining the defendant, we must now consider whether the police had probable cause to arrest the defendant in light of the events leading up to the stop and the subsequent discovery of the weapon and contraband. The trial court found that because the pursuit of the defendant was illegal, the items dropped during the pursuit were tainted and could not be the basis of a lawful arrest.[4] The court concluded, therefore, that the arrest of the defendant was illegal, and that the search incident to the arrest was illegal. As stated earlier, the trial court erred when it found that the investigative method used by the police was illegal and tainted the entire operation. We therefore review the facts found by the trial court, absent this erroneous premise, to determine whether probable cause existed to arrest the defendant.

"[E]very arrest and every seizure having the essential attributes of a formal arrest, is unreasonable unless

cover the marijuana contained therein. We conclude, therefore, that the stop was "reasonably related in scope to the circumstances which justified the interference in the first place."

[4] The trial court also concluded that the state had not established that the defendant had abandoned the cocaine and revolver. "The significance of abandoned property in the law of search and seizure lies in the maxim that the protection of the fourth amendment does not extend to it. Thus, where one abandons property, he is said to bring his right of privacy therein to an end, and may not later complain about its subsequent seizure and use in evidence against him. In short, the theory of abandonment is that no issue of search is presented in such a situation, and the property so abandoned may be seized without probable cause." E. Mascolo, "The Role of Abandonment in the Law of Search and Seizure: An Application of Misdirected Emphasis," 20 Buff. L. Rev. 399, 400–401 (1971), quoted in, 1 W. LaFave, Search and Seizure, (2d Ed. 1987) § 2.6 (b) pp. 463–64; see also *Abel* v. *United States,* 362 U.S. 217, 80 S. Ct. 683, 4 L. Ed. 2d 668, reh. denied, 362 U.S. 984, 80 S. Ct. 1056, 4 L. Ed. 2d 1019 (1960). In view of our conclusions in this case, we need not determine whether the trial court was correct in its decision in this regard.

it is supported by probable cause." *Michigan* v. *Summers,* 452 U.S. 692, 700, 101 S. Ct. 2587, 69 L. Ed. 2d 340 (1981). Probable cause exists if (1) there is probable cause to believe a crime has been committed, and (2) there is probable cause to believe that the person to be arrested committed the crime. *State* v. *Heinz,* 193 Conn. 612, 616–17, 480 A.2d 452 (1984); *State* v. *Daley,* 189 Conn. 717, 720, 458 A.2d 1147 (1983). As its name implies, probable cause deals with probabilities, which are not technical, but are " 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " *Illinois* v. *Gates,* 462 U.S. 213, 231, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983), quoting *Brinegar* v. *United States,* 338 U.S. 160, 175, 69 S. Ct. 1302, 93 L. Ed. 1879, reh. denied, 338 U.S. 839, 70 S. Ct. 31, 94 L. Ed. 513 (1949).

We find that the facts found by the trial court fully support the conclusion, as a matter of law, that probable cause existed to believe that the defendant illegally possessed narcotics in violation of General Statutes § 21a-279 (a), and that he carried a pistol without a permit in violation of General Statutes § 29-35. The flight of the defendant, his failure to respond to the police officer's request to stop, his speeding up at the request of the police to stop, his dashing through a public restaurant, his furtive actions while running, his attempt to exit through the back door, his change of course through the bathroom, his throwing motions, seemingly to divest himself of contraband, the sounds of the fallen objects and their discovery in close proximity to the defendant reasonably and logically support a conclusion that the mere suspicion needed to support a *Terry* stop had evolved and ripened into probable cause to justify a warrantless arrest. The trial court's conclusion to the contrary was erroneous.

There is error, the judgment is set aside and the case is remanded with direction to deny the defendant's

motion to suppress and motion to dismiss, and for further proceedings in accordance with law.

In this opinion the other judges concurred.