STATE OF CONNECTICUT *v.* SHERMAN COFIELD
(7901)

DUPONT, C. J., O'CONNELL and LAVERY, Js.

Argued December 8, 1989—decision released May 4, 1990

*Temmy Ann Pieszak,* assistant public defender, with whom, on the brief, was *G. Douglas Nash,* public defender, for the appellant (defendant).

*Mitchell S. Brody,* assistant state's attorney, with whom, on the brief, was *John T. Redway,* state's attorney, for the appellee (state).

DUPONT, C. J. The defendant appeals from the judgment of conviction rendered after entry of a conditional plea of nolo contendere pursuant to General Statutes § 54-94a,[1] to charges of possession of narcotics with intent to sell in violation of General Statutes § 21a-277 (a), possession of marihuana in violation of General Statutes § 21a-279 (c), and interfering with an officer in violation of General Statutes § 53a-167a. The defendant received a sentence of three years and nine months with no probation. The issues on appeal are whether the trial court properly denied the defendant's motion to suppress evidence obtained at the time of his arrest and whether the court properly granted permission to the state to retain a copy of the presentencing investigation report prepared for the defendant's sentencing hearing.

[1] General Statutes § 54-94a provides in pertinent part: "When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress evidence based on an unreasonable search or seizure . . . the defendant after the imposition of sentence may file an appeal within the time prescribed by law. The issue to be considered in such an appeal shall be limited to whether it was proper for the court to have denied the motion to suppress . . . ."

On the evening of November 21, 1987, the defendant drove a companion to a parking lot in the Maplewood Terrace housing project in Middletown. After dropping off his companion, he met two other men with whom he was acquainted. The two men entered the defendant's parked car, which was a 1988 white Pontiac LeMans.

On the same evening, Frank Violissi, the officer in charge of the street crime unit of the Middletown police department, received a telephone call from a confidential informant about a black male selling drugs from a car in a parking lot at Maplewood Terrace. Violissi arranged to meet the informant and drove to the meeting in an unmarked car with two other members of the Middletown police department. The three officers met with the informant at a location a short distance from Maplewood Terrace and arranged for the informant to make a controlled buy of narcotics from the alleged drug seller. The informant left to make the buy and the officers remained in their vehicle at that location. From where they waited, the officers could not see the housing project.

About fifteen minutes later, the informant returned with what appeared to be cocaine. He told the officers that he had purchased the drugs from a black male named Sonny who was wearing a red hat and was seated in the driver's seat of a 1987 blue Chevrolet Beretta. Two other men were also seated in the vehicle. The informant also told the officers that the car was parked in a specific spot in parking lot three of Maplewood Terrace and was facing the road.

Violissi then drove to Maplewood Terrace with the other officers and entered lot three, which was well lighted and almost full. He turned off the headlights of the vehicle so as not to be seen and drove toward

a white car in which three men were seated. The police observed the vehicle from the rear for about thirty seconds at a distance of about ten to fifteen feet and saw no suspicious activity. The court found that the car was "parked in a place, an area described by [the] informant." Violissi then backed up the police car about thirty-five feet to where it could not be seen by the occupants of the white car. He and one of the other officers, both dressed in plain clothes with badges on chains around their necks, decided to approach the white car on foot. Violissi testified that on the basis of his experience, his "gut feeling," and his knowledge that this was a high crime area, he believed that he was in a potentially life threatening situation. Consequently, he drew his gun and carried it by his side while walking quickly to the driver's side of the car. The other officer approached the passenger side of the car in the same manner but did not draw his gun.

When Violissi reached the rear driver's side of the white vehicle, the driver looked in his outside rearview mirror and saw a man with a gun rapidly approaching his door. He turned around and looked at Violissi through the car window. Violissi testified and the court found that the defendant then exited the car, pushed Violissi, and began throwing things from his clothing. Violissi testified that he recognized the objects being thrown as money and contraband. He identified himself as a police officer and grabbed the defendant with his left hand while holding his gun in his right hand. A scuffle ensued in which Violissi stuck the barrel of his gun into the defendant's mouth in order to subdue him. All three occupants were subsequently arrested and charged with various crimes. The blue Chevrolet Beretta, the person who sold cocaine to the informant and the two other occupants of the Beretta were never found.

I

In its ruling on the suppression motion,[2] the trial court, *Stengel, J.,* found that the informant was reliable, that the police officers had been able to corroborate the informant's information, and that the officers had a reasonable and articulable suspicion of criminal activity on which to base their initial investigative approach to the defendant's car. It further found that suspicion ripened into probable cause to arrest the defendant when the defendant pushed Violissi and threw drugs and money on the ground.

On appeal, the defendant challenges the court's conclusion that the initial stop was justified by a reasonable and articulable suspicion of criminal activity. He argues that he was seized within the meaning of the fourth amendment to the United States constitution when he saw Violissi approaching his car with his gun drawn, that the police did not have the requisite level of suspicion for the stop and that the evidence obtained therefrom should have been suppressed.[3]

The central issue of this appeal is whether the police had a reasonable and articulable suspicion of criminal activity to justify an investigative stop. The threshold issue is whether an investigative stop occurred at all, and, if so, when. The state argues that the defendant was not seized when he saw Violissi with the gun and, alternatively, that Violissi had a reasonable and articulable suspicion of criminal activity at that time. While it is true that not all contacts between police officers

[2] The evidence sought to be suppressed included less than one quarter of an ounce of marihuana, a driver's license, a small plastic bag coated with cocaine residue and $91.

[3] In the alternative, the defendant claims that he was arrested when he saw Violissi in his rearview mirror and that there was no probable cause for the arrest. Because we find that the police officers did not have a reasonable basis for the initial stop, we do not reach this claim.

and members of the public amount to seizures implicating constitutional rights; *Terry* v. *Ohio,* 392 U.S. 1, 19 n.16, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); a seizure occurs when "the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . . ." Id. *State* v. *Williamson,* 10 Conn. App. 532, 540, 524 A.2d 655, cert. denied, 204 Conn. 801, 525 A.2d 965 (1987). Examples of actions by police that might indicate a sufficient show of authority include "the threatening presence of several officers, *the display of a weapon by an officer,* [or] some physical touching of the person of the citizen . . . ." (Emphasis added.) *United States* v. *Mendenhall,* 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497, reh. denied, 448 U.S. 908, 100 S. Ct. 3051, 65 L. Ed. 2d 1138 (1980).

The state in the present case argues that no seizure took place despite the presence of the drawn gun because Violissi had not used the gun to communicate his authority or to control the defendant. The test for determining whether a seizure has taken place, however, is not whether the officer intended to communicate his authority to the defendant by display of a gun, but whether, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Id; *State* v. *Martin,* 2 Conn. App. 605, 611, 482 A.2d 70 (1984), cert. denied, 195 Conn. 802, 488 A.2d 457, cert. denied, 472 U.S. 1009, 105 S. Ct. 2706, 86 L. Ed. 2d 721 (1985). The state's argument that a reasonable person in the defendant's position would not have felt that his freedom had been restrained upon seeing a police officer with a drawn gun approaching his parked car in a parking lot at night is less than reasonable. Testimony indicated that there were no other people in the general area, that Violissi had already reached the defendant's car when he was first observed, and that he was rapidly

approaching the driver's door. While the presence of a gun does not automatically convert an investigatory stop to an arrest; *State* v. *Holloman,* 20 Conn. App. 521, 526, 568 A.2d 1052 (1990); *State* v. *Wylie,* 10 Conn. App. 683, 687, 525 A.2d 528, cert. denied, 204 Conn. 807, 528 A.2d 1154 (1987); it is at least evidence of authority strong enough to lead a reasonable person to believe that he is not free to leave. See *United States* v. *Mendenhall,* supra. We find that the defendant was the target of an investigatory stop and, therefore, was seized within the meaning of the fourth amendment to the United States constitution when he first saw Violissi in his rearview mirror. See *Terry* v. *Ohio,* supra.

Seizures implicating the fourth amendment need not be supported by probable cause for an arrest. "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams* v. *Williams,* 407 U.S. 143, 145, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1971); *State* v. *Holloman,* supra, 525. Rather, police may momentarily detain a person for investigatory purposes if they are "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry* v. *Ohio,* supra, 21; *State* v. *Aversa,* 197 Conn. 685, 691, 501 A.2d 370 (1985). In assessing the reasonableness of an investigatory stop, "the totality of the circumstances—the whole picture—must be taken into account. On the basis of that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States* v. *Cortez,* 449 U.S. 411, 417–18, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981); *State* v. *McMullen,* 2 Conn. App. 537, 540, 480 A.2d 594 (1984).

Although the trial court in the present case did not identify the point in time at which the initial seizure occurred, it concluded that the police had a reasonable basis for an investigative detention. In its oral memorandum of decision, the trial court stated that Violissi "was familiar with the defendant and knew he had been involved with drug use. Therefore, it is found that the police had reasonable and articulable suspicion of criminal activity to investigate and initially detain the defendant." It is clear from this statement that the court considered Violissi's alleged familiarity with the defendant as an element of the reasonable suspicion justifying the seizure. The defendant argues that the court was mistaken in its conclusion because that conclusion was based in part on information gained by the police during the course of the detention.

At the suppression hearing, Violissi testified that he first recognized the driver of the white car as the defendant when the defendant turned around and looked at Violissi through the window. Since we have found that the seizure occurred earlier, when the defendant first saw Violissi in the rearview mirror, Violissi's recognition of the defendant could not have formed the basis of a reasonable and articulable suspicion justifying the seizure. Information gained during the course of an investigative stop cannot be used to justify making the stop in the first place. See *State* v. *Williamson,* supra, 540. We must, therefore, determine whether the police had a sufficient basis for their initial detention independent of Violissi's alleged familiarity with the defendant.

The trial court's conclusion that the police had sufficient justification for the stop was also based on the reliability of the informant and on the fact that the police found three men in a car in the general area of the parking lot where the informant had reportedly pur-

chased drugs. The defendant does not challenge the reliability of the informant, but argues that this very reliability undermined the reasonableness of the police officers' suspicion. Violissi testified that the informant had provided reliable and accurate information to the police in the past and that the officers had expected to find the 1987 blue Chevrolet Beretta described by the informant. Instead, upon arriving at parking lot three, the police found a 1988 white Pontiac LeMans. Violissi admitted to having had some doubt about whether they had found the car involved in the drug transaction because of the discrepancy in color, but testified that the informant had not told him the shade of blue and that "a real light blue car and white, in the nighttime, could be similar." The court excused the discrepancy in make, model and year by finding that Violissi, a seventeen year veteran of the police force, did "not have a basic knowledge of what different automobiles are. He is not fully aware of the different makes of cars." The other officers did not testify as to their ability to recognize cars by makes and models. A photograph of the defendant's car offered as evidence at the hearing showed the words "Pontiac LeMans" on the rear of the vehicle.

A description by an informant or an eyewitness need not be absolutely accurate in all respects in order to provide a basis for an investigatory stop. In cases where discrepancies exist, courts must consider "the strength of those points of comparison which do match up and whether the nature of the descriptive factors which do not match is such that an error as to them is not improbable . . . ." 3 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment (1978) § 9.3 (d); see also *Luckett* v. *State,* 259 Ind. 174, 284 N.E.2d 738 (1972). In *State* v. *Rodriguez,* 11 Conn. App. 140, 525 A.2d 1384 (1987), this court found the investigative stop of the defendant justified, even though the defendant

arrived at the scene of the stop in a different vehicle than that described by a reliable informant. In that case, however, the car was a minor detail, there was no question as to the defendant's identity, and all other points of comparison matched.

In *Luckett* v. *State,* supra, an eyewitness described a car leaving the scene of a possible burglary as a green Chevrolet with a license plate prefix of 82J. The Indiana Supreme Court upheld a stop based on that description of a green car with the same prefix, even though the car stopped was an Oldsmobile rather than a Chevrolet. Id., 181. The court considered the deviation to be insubstantial in light of the similarities and the fact that the car was discovered traveling away from the scene of the crime in a location within the range of possible flight. Id. Similarly, in *United States* v. *Wantland,* 754 F.2d 268 (8th Cir. 1985), police stopped a 1971 gold Plymouth Duster with Illinois license number 104-849 based on an eyewitness description of a getaway car in a bank robbery as a 1971 gold Dodge Dart with Illinois license number 104-819. The court concluded that the similarity of the car and the license plate to the description justified the stop, noting that the detaining officer testified that it was common for eyewitnesses to be a few digits off on license numbers. Id., 270.

Our recent holding in *State* v. *Holloman,* supra, is inapposite to the present case. In *Holloman,* we found that the police were justified in stopping the defendant's vehicle to investigate a recently committed robbery based on an unverified tip by a citizen. In that case, however, the defendant matched a description given by the victim, and the citizen had previously seen the defendant in a car that he thought matched that used in the robbery. Moreover, the police had an independent basis for the stop because the license plate on the stopped vehicle was registered to another vehicle. Id.

In sharp contrast is the present case. Here, the information was provided not by an eyewitness who happened to observe a crime, but by an experienced, reliable informant who, on this occasion, was working in concert with the police for the specific purpose of obtaining and providing accurate information about a specific criminal activity. The informant described the vehicle from which the drugs were sold with particularity and certainty and did so immediately after his controlled buy of drugs. The vehicle in which the defendant was seated when seized differed from that described on every point, that is, color, make, model and year. It is improbable that, having given such a detailed description, the informant would have been mistaken as to every detail. The only points of comparison that did match were unremarkable and could have fit a wide range of presumably innocent persons. Although there were three dark skinned men in the car, Violissi testified that that was not an unusual sight in the predominantly black and Hispanic Maplewood Terrace housing project. None of the men in the car was wearing a red hat or any hat at all and no suspicious activity was observed. Moreover, the police could not see the entrance to the project or the parking lot during the time the informant was away and they were aware that the car from which the drugs were sold could easily have left the project or could have been driven to another parking lot in the project or to another parking space in the same lot.

While police are not required to conduct an exhaustive investigation prior to conducting a *Terry* stop, here we find that the obvious discrepancies between the informant's description and the situation found by the police rendered the officers' suspicion speculative and unreasonable. We conclude that the information available to the police did not, without further corrobora-

tion, amount to a reasonable and articulable suspicion that the defendant was the person who had sold drugs to the informant.

Because we find the defendant's federal constitutional claim to be dispositive on this issue, we do not address his argument that the seizure violated his rights under the constitution of Connecticut, article first, §§ 7 and 9.

## II

During the sentencing hearing, the state requested and was granted permission to retain a copy of the defendant's presentencing investigation report (PSI). The trial court, *R. O'Connell, J.*, ruled that it was "in the best interest of the state and of society as a whole for the state's attorneys to have [the PSI] available to them in their office in carrying out the duties imposed on them by both the constitution of the state of Connecticut and the statutes of the state of Connecticut."

The defendant argues that the court's ruling violates the letter and the spirit of Practice Book §§ 915 through 917. He contends that Practice Book § 916 implicitly requires a showing of good cause in order to gain the court's permission to retain a copy of the PSI and that, in this case, the court improperly excused the state from making such a showing. The state argues that the court's ruling was a proper exercise of discretion authorized by § 916.

"PSIs result from a presentence inquiry into the circumstances of the offenses, the attitude of the victim or his immediate family, the criminal record, social history and present condition of the defendant, and, if desirable, the mental and physical state of the defendant. General Statutes § 54-91a (formerly § 54-109); Practice Book § 911. 'Their sole purpose is to enable the court, within the limits fixed by statute, to impose

an appropriate penalty fitting the offender as well as the crime.' *State* v. *Gullette*, 3 Conn. Cir. 153, 167, 209 A.2d 529 (1964)." *Steadwell* v. *Warden*, 186 Conn. 153, 158–159, 439 A.2d 1078 (1982). Because PSIs contain personal, and possibly embarassing information about the defendant, access to them is limited. *State* v. *Fair*, 197 Conn. 106, 113, 496 A.2d 461, cert. denied, 475 U.S. 1096, 106 S. Ct. 1494, 89 L. Ed. 2d 895 (1985).

Access to and use of PSIs are governed by Practice Book §§ 915 through 917. Section 915 provides in part that copies of the PSI "shall be provided to the prosecuting authority and to the defendant or his counsel in sufficient time for them to prepare adequately for the sentencing hearing . . . ." Section 917 provides in part that the PSI "shall not be a public record and shall not be accessible to the public. It shall be available initially to the parties designated in Sec. 915 for use in the sentencing hearing and in any subsequent proceedings wherein the same conviction may be involved . . . ." In addition, § 917 authorizes a court of proper jurisdiction to order that the PSI be made available to counsel for the parties for the purpose of any proceeding before the court where the PSI is relevant. It also makes the PSI available to "[c]ounsel for the defendant and the prosecuting authority *during negotiations* relating to other offenses pending against the defendant or subsequently charged against him . . . ." (Emphasis added.)

Section 916 further reinforces the nonpublic, confidential nature of the PSI by providing that the "report and copies thereof made available under Sec. 915 shall be returned to the probation officer or delivered to the clerk immediately following the imposition of the sentence. No person shall, without the permission of the court, make or cause to be made any copy of any presentence investigation report except as authorized by Secs. 915 and 917."

The last sentence of § 916, investing the trial court with discretion to permit copies of the PSI to be retained in situations not authorized by §§ 915 and 917, was added in 1981 when the rule was amended. It replaced prior language in the rule that allowed the prosecuting authority and the defense counsel to retain a copy of the PSI. The amendment made it clear that nonaccess, except as authorized in §§ 915 and 917, is the rule, and that any exceptions to this rule must be made by the trial court in an exercise of its discretion.

The exercise of discretion by a trial court necessarily involves the balancing of competing interests. "Discretion . . . imports something more than leeway in decision-making." *State* v. *Corchado,* 200 Conn. 453, 464, 512 A.2d 183 (1986); *State* v. *Onofrio,* 179 Conn. 23, 29, 425 A.2d 560 (1980). Discretion should be exercised to conform with the spirit of the law and in a manner to promote and not to defeat the ends of substantial justice. *State* v. *Corchado,* supra; *Buckley* v. *Warden,* 181 Conn. 286, 290, 435 A.2d 348 (1980).

At the sentencing hearing in the present case, the state argued that because the majority of people sentenced in Connecticut return to the court on other charges, the state should be able to retain a copy of the PSI to assist in future plea bargaining. It also argued that the PSI should be available because of the possibility of future parole violations or sentence reviews. The defendant objected to these arguments as speculative, noting that he had not received probation as part of his sentence. He also argued that the state's arguments were too general and could be made in any criminal case, since it is possible that any given defendant will later be prosecuted for another crime.

On the basis of our review of the transcript of the sentencing hearing, we conclude that the court's decision to allow the state to retain a copy of the PSI did

not conform to the intent of §§ 915 through 917. If the drafters of the rules had intended to allow the state to retain perpetually copies of PSIs in their files, they would not have eliminated the language in § 916 that expressly authorized that practice. We hold that, in order to invoke the exception to nonaccess found in § 916, a requesting party must make a showing of need particular to the case before it.

The judgment is reversed and the case is remanded with direction to grant the motion to suppress and to order the prosecuting attorney to return all copies of the PSI.

In this opinion LAVERY, J., concurred.

E. Y. O'CONNELL, J., dissenting in part and concurring in part. I cannot agree with the opinion of the majority reversing the trial court's ruling on the motion to suppress evidence. My disagreement is based on my conclusion that Sergeant Frank Violissi had a reasonable, articulable suspicion to make the *Terry* stop. *Terry* v. *Ohio,* 392 U.S. 1, 88, S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

The trial court, after hearing the evidence, concluded that the police did have a reasonable and articulable suspicion of criminal activity and properly stopped the defendant for investigative purposes. This conclusion may be overturned by us only if we find, from the whole record, that it was clearly erroneous. *State* v. *Ortiz,* 17 Conn. App. 102, 104, 550 A.2d 22, cert. denied, 209 Conn. 828, 552 A.2d 1216 (1988); *State* v. *Williamson,* 10 Conn. App. 532, 537, 524 A.2d 655, cert. denied, 204 Conn. 801, 525 A.2d 965 (1987). I submit that such is not the case here. The fact that there were discrepancies between what Violissi viewed at the scene and the otherwise corroborated report of the informant does not vitiate Violissi's reasonable suspicion. That is why we call it *suspicion,* albeit a *reasonable* suspicion. It is

inherent in the word suspicion that doubt, uncertainty and ambiguity exist in the questioned behavior. See Black's Law Dictionary (5th Ed.). ("Suspicion implies a belief or opinion based upon facts or circumstances which do not amount to proof.") In the present case, Violissi was approaching the defendant's car to confirm or negate these doubts, and the trial court, in finding that he had articulated valid reasons for his suspicion, was not clearly erroneous.

I submit that Violissi was not wandering aimlessly through this parking lot, randomly stopping vehicles at his whim and arbitrarily searching them. Nor was he acting on a mere hunch or on some vague inexplicable intuition. He was able to articulate the reasons why he was there and why he suspected that this particular vehicle was occupied by a drug dealer.[1]

---

[1] An examination of the whole record discloses the following evidence that supports the trial court's decision.

Just before 9 p.m., Sergeant Frank Violissi of the Middletown police department received a telephone call from a reliable, confidential informant who had previously furnished information concerning drug sales that had led to arrests and convictions. This informant reported that a black male drug dealer was at that moment selling cocaine from a car in the vicinity of Maplewood Terrace. Violissi immediately arranged to meet the informant at a point less than a minute's drive from Maplewood Terrace. The informant was searched to make sure that he had no drugs on his person and then was given money to make a "controlled buy." The informant proceeded to the Maplewood Terrace parking lot and returned shortly thereafter with what, by his training and experience, Violissi believed to be cocaine. The informant told Violissi that he had purchased the cocaine from a black male. The informant described the person, whom he said was in a blue Chevrolet Beretta, and also gave the location where the Beretta was parked.

Relying on the informant's tip and the supporting drug buy, Violissi proceeded to the parking lot for further investigation. No more than twenty minutes elapsed from the time of the controlled buy to Violissi's entering the parking lot. Violissi was not conversant with the many makes and models of automobiles and did not know what a Chevrolet Beretta looked like. He did know, however, from information furnished by the informant, that he was looking for a new car.

Upon entering the parking lot, Violissi observed a new white car parked in the exact location and facing in the exact way that the informant had

"The fact finding function is vested in the trial court with its unique opportunity to view the evidence presented in a totality of circumstances, i.e., including its observations of the demeanor and conduct of the witnesses and parties, which is not fully reflected in the cold, printed record which is available to us." *Lupien* v. *Lupien,* 192 Conn. 443, 445, 472 A.2d 18 (1984). Accordingly, it was for the trial court to determine how much weight to give to Violissi's testimony. *State* v. *Hamilton,* 17 Conn. App. 385, 389, 552 A.2d 834 (1989), aff'd, 214 Conn. 692, 573 A.2d 1197 (1990). It was not for this court to cast doubt upon his credibility based on his experience as a police officer, the lighting conditions in the parking lot, his knowledge of makes and models of cars or his opinion concerning various shades of car colors. Id. Nor was it for this court to speculate that the "real" car might have been driven away from the designated parking place.

This court cannot sift and weigh evidence. *Robert S. Weiss & Co.* v. *Mullins,* 196 Conn. 614, 621, 495 A.2d 1006 (1985); *State* v. *Staples,* 175 Conn. 398, 407, 399 A.2d 1269 (1978). We do not examine the record to determine whether the evidence could have led the trier of fact to a different decision. *Cook* v. *Nye,* 9 Conn. App. 221, 225, 518 A.2d 77 (1986). A finding may not be rejected merely because the appellate judges personally disagree with the trial court's conclusion or would have found differently if they had sat as the factfinder. *Lupien* v. *Lupien,* supra, 446. When there might be an

reported. In addition, it was occupied by three dark skinned males, just as the informant had said. Unfortunately, the informant had not indicated whether the car was dark blue or very light blue in color. Nevertheless, Violissi knew that at night, and under certain lighting conditions, a light blue car could appear white. Furthermore, the vehicle was not clearly marked as to its make and model. Sergeant Violissi was not certain that this was the correct vehicle, but he nevertheless felt that he had sufficient information to merit further investigation. He therefore decided to approach the vehicle to investigate the matter further.

honest difference of opinion as to the conclusion to be drawn from the evidence, the finding of the trial court is conclusive. *State* v. *Staples,* supra. In my opinion, the majority invaded the province of the trial court. It weighed the evidence, determined which portion was credible, which portion it doubted and then substituted its findings for those of the judge who heard the evidence. This is not allowed. *State* v. *Hamilton,* supra; see also *State* v. *Copeland,* 205 Conn. 201, 208 n.3, 530 A.2d 603 (1987) (appellate courts do not find facts).

I respectfully dissent from the opinion of the majority on the issue of whether there was a reasonable and articulable suspicion for the stop. Otherwise, I concur in the decision of the majority.