[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE.
Defendant Adam Mitchell, who was arrested in Middletown on March 24, 1993, has filed a Motion to Suppress Evidence seized from him pursuant to the United States and Connecticut Constitutions. A suppression hearing was held on July 8, 1993. William J. Clayton, the arresting officer, was the sole witness at the suppression hearing. Defendant and the State have fully briefed the issue. For the reasons stated below, the motion to suppress is granted.
I. Factual Background
The relevant facts, taken entirely from Officer Clayton's testimony, are as follows:
On March 24, 1993, Officer Clayton, who had worked with the Middletown Police Department since November, 1983, was on routine patrol. In his career, he had investigated burglaries, larcenies and narcotics cases, and he estimated he had made over 100 street arrests. On March 24, 1993, he was fully uniformed, wearing his badge, and armed, working the 3:45 p.m. to 11:45 p.m. shift, patrolling north of Washington Street, in the area of Main Street and Ferry Street. This is a commercial area with a high volume of street activity, only blocks from a number of stores, include a toy store.
At approximately 5:15 p.m., while standing in front of the police department substation, he observed a heavy-set white male standing near the corner of Main and Ferry Streets. The man was the defendant. Officer Clayton knew defendant by face but not by name. Officer Clayton was aware that Mitchell had had previous arrests, having been part of an investigation CT Page 832 of defendant in connection with a reported theft of a fur coat from a coat rack at the Middlesex Opera House. He had conducted some preliminary investigation, then turned the case over to another officer who finished it. Officer Clayton testified that the investigation had established that defendant had taken the fur coat from the opera house to another location and sold it. However, Officer Clayton testified, defendant was not arrested because the victim did not want to pursue charges against Mitchell.
As he observed the defendant, Officer Clayton saw that he had a large box on his shoulder, and was holding it with one arm. The box was brightly colored, approximately 2 1/2-3 feet long, 6 to 8 inches high, and a foot around. Defendant was observed talking to a female who had approached him for 1 1/2 to 2 minutes. This conversation appeared "out of the ordinary" to Officer Clayton, who concluded that "it was possible" that defendant was trying to sell the box. Officer Clayton then observed another female approach defendant, and, from a distance of 10 feet, enter into a conversation that lasted 30 seconds to a minute. Officer Clayton had never seen defendant in the north end before, and thought that defendant was "out of his environment."
After observing the second female leave the area, Officer Clayton decided to walk towards defendant, making eye contact with him. Defendant stopped pacing and started to walk south on Main Street, away from Clayton, who followed defendant. Officer Clayton then asked defendant to "stop and come here, so I can talk to you." Defendant was hesitant and then slowly walked toward Clayton, meeting him halfway. Defendant appeared nervous. Clayton asked Mitchell what he had in the box, and Mitchell replied that it was a Nintendo game he had received from a friend in Cromwell. Officer Clayton asked Mitchell if he was attempting to sell the game in the north end, and Mitchell denied that was his intention. Clayton asked Mitchell additional questions about the box and then asked defendant if he could see it. In response, Mitchell handed it over. To this point, Mitchell had not been placed under arrest, nor was he threatened, nor were weapons displayed.
Officer Clayton held the box in front of him, looking for a price tag or some indication of where it had come from, and inspecting it, while Mitchell nervously looked on. Clayton asked, several times, what was in the box and Mitchell continued CT Page 833 to say it was a Nintendo game. Clayton then asked if he could look in the box, and Mitchell said he could. Clayton opened the box and found a sawed-off shotgun in it. Clayton then dropped the box and placed Mitchell, who had begun to walk away, under arrest. Officer Clayton then seized the sawed-off shotgun, shotgun shells on Mitchell's person, the empty box, and a dirty white rag in the box. Defendant seeks the suppression of all of these objects. Defendant also seeks suppression of a statement he made following his arrest in which he made inculpatory statements concerning his conduct.
More significant than what Officer Clayton did see and knew is what he did not claim to have observed or known. He did not claim to have observed any overt criminal conduct occurring. He did not claim to have observed any money changing hands. There was nothing about Mitchell's clothing or appearance that aroused suspicion. The conduct he observed all took place in daylight, in a nonresidential area not far from the town's commercial center. Mitchell was approached by the two women he spoke to, not the other way around. Officer Clayton testified that he was unaware of any particular criminal conduct having occurred in the vicinity that day, was unaware of any firearms having been stolen, and was not investigating Mitchell when he happened upon him. In summary, what Officer Clayton observed was innocuous conduct, undertaken by someone having a right to be where he was.
In deciding defendant's motion, the court must decide, first, whether Mitchell was seized by Officer Clayton, and if so, when; and second, if Mitchell was seized, whether there was a reasonable and articulable basis for the seizure. These questions will now be addressed.
II. Was Mitchell Seized by Officer Clayton, and If So, When?
All interactions between private citizens and the police do not implicate the Fourth Amendment to the United States Constitution.[1] State v. Leonard, 31 Conn. App. 178, 185
(1993). However, an investigatory stop is a seizure that implicatesFourth Amendment rights. Terry v. Ohio, 392 U.S. 1,88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Terry governs prearrest detention under the Connecticut Constitution. State v. Oquendo, 223 Conn. 635, 646-47 (1992).
The Connecticut Supreme Court has defined a person as CT Page 834 "seized" when "by means of physical force or a show of authority, his freedom of movement is restrained." State v. Ostroski,186 Conn. 287, 291, cert. denied, 459 U.S. 878, 103 S.Ct. 173,74 L.Ed.2d 142 (1982), quoting United States v. Mendenhall,446 U.S. 544, 553-54, 100 S.Ct. 1870, 64 L.Ed.2d 497, reh. denied 448 U.S. 908, 100 S.Ct. 3051, 65 L.Ed.2d 1138 (1980). In determining whether a seizure has occurred, a court must ask whether "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." State v. Ostroski, supra, 292, quoting United States v. Mendenhall, supra, 554. See also, State v. Oquendo, supra, 647. Whether a seizure has occurred in a particular case is a question of fact. State v. Ostroski, supra. What starts out as a consensual encounter can become a seizure if on the basis of a show of authority by a police officer, a reasonable person in the defendant's position would have believed he was not free to leave. State v. Ostroski, supra, 291-92.
In this case, a number of factors persuade the court that Mitchell was "seized" when Officer Clayton first approached him and instructed him to stop.[2] Officer Clayton was armed and in uniform and wearing his badge. He had watched Mitchell, made eye contact with him, observed Mitchell walk away, followed him, and ordered him to stop and return. This encounter all occurred not far from the police substation. Officer Clayton conceded that if defendant had not stopped when first instructed to do so, he would have probably "walked, caught up to him, walked along side of him, and talked to him. Talked him into stopping." In the court's view, a reasonable person in Mitchell's position would not have believed he was free to ignore Officer Clayton's command and leave given Officer Clayton's pursuit. The court concludes that a "seizure" took place, even prior to Officer Clayton's beginning to question Mitchell about the contents of the box. See State v. Williamson,10 Conn. App. 532, 539-41 (1987).
III. Was there a reasonable and articulable basis of suspicion for the seizure?
Having concluded that Mitchell was "seized," the court must next determine if the seizure was based on a reasonable and articulable basis. See Terry v. Ohio, supra; State v. Oquendo, supra. As our Supreme Court stated in State v. Oquendo, 236 Conn. at 635: CT Page 835
 Article first, 7 and 9 of our state constitution permit a police officer `in appropriate circumstances and in an appropriate manner' to detain an individual for investigative purposes even though there is no probable cause to make an arrest. . . In determining whether the detention was justified in a given case, a court must consider if `based upon the whole picture the detaining officers [had] a particularized and objective basis for suspecting the particular person stopped of criminal activity.' . . . A court reviewing the legality of a stop must therefore examine the specific information available to the police officer at the time of the initial intrusion and any rational inferences to be derived therefrom.
(Citations omitted).
Officer Clayton testified that seven factors, cumulatively, led him to stop Mitchell. These factors will now be discussed.
1. The area was known to be a high crime area.
Officer Clayton characterized the area where Mitchell was seized as an area with a high volume of criminal activity. The State correctly argues that the nature of the area in which a stop occurs can be considered in evaluating the basis for the officer's suspicion. State v. Moreland, 23 Conn. App. 495, 497
(1990). The same "high crime area" characterization could unfortunately be made, however, about many urban areas, and the State provided no evidence as to the incidence of crime in the area. More significantly, the State provided no evidence of any particular criminal activity in the area that day or week. Officer Clayton testified he was unaware of any specific criminal activity in the vicinity where he saw Mitchell. He also testified that prior to seeing Mitchell, he was not investigating him. This factor is entitled to little weight given the circumstances of this case.
2. Defendant was "out of his environment." CT Page 836
Officer Clayton testified that Mitchell appeared to be "out of his environment." However, Mitchell had a right to be where he was, downtown, during daylight hours, in an area not far from Middletown's commercial area. A history of past criminal activity in a locality does not justify a diminution of the constitutional rights of everyone, or anyone, who may subsequently be in that locality. Oquendo, supra, at 655, fn. 11, citing State v. Cofield, 220 Conn. 38, 50-51 (1991) (Glass, J., dissenting).
3. Talking to two females for short periods of time.
Officer Clayton testified that he observed two females approach Mitchell and engage in brief conversations. He did not testify that he saw either of them inspect the box or offer money. Moreover, the fact that they approached Mitchell, not the other way around, is significant. The conduct of the two females is consistent with a variety of normal, everyday actions aside from illegal pursuits, including, possibly, innocent conversation; a request for directions; an inquiry about where to catch a bus; and the like.
4. Carrying a new Nintendo box.
Given the testimony that the area was an area of commercial activity, and that a toy store was in the general vicinity, the fact that defendant was carrying a new Nintendo box is of only minimal significance.
5. Middlesex Opera House incident.
Officer Clayton testified that Mitchell was investigated in connection with the theft of a fur from the Middlesex Opera House. However, Mitchell was not arrested, much less convicted, as an outgrowth of this previous investigation, distinguishing this case from the situations presented in State v. Foster, 13 Conn. App. 214 (1987) and State v. Januszewski,182 Conn. 142 (1980), relied upon by the state.
6. and 7. Defendant's nervousness and attempt to walk away.
Officer Clayton testified that Mitchell's nervousness and attempt to walk away were factors entering into his decision to "seize" Mitchell. The state argues that Mitchell's decision to walk away was an "evasive action" that was "the CT Page 837 functional equivalent of flight," State's Memorandum in Opposition at 8, and cites State v. Barnes, 16 Conn. App. 333 (1988) in support. Barnes, however, is distinguishable on its facts, involving defendants laden with Christmas gifts, running, and looking back over their shoulders.
Defendant may have been motivated by a desire to avoid an encounter with Officer Clayton, but his actions were not necessarily inconsistent with the actions of a person engaging in innocent, unobjectionable behavior. Moreover, as the court noted in Oquendo, police conduct that provokes flight precludes consideration of flight as a meaningful factor in determining whether there existed a reasonable and articulable basis of suspicion. Oquendo, supra, at 655-656.
In summary, analysis of the individual factors cited by Officer Clayton leads the court to conclude that he lacked a reasonable and articulable factual basis to seize Mitchell when he did.
The court notes the State's concern that court-ordered suppression of evidence of crime could deter police officers, charged with making split-second decisions in dangerous circumstances, from aggressively pursuing signs of criminal activity. But this concern cannot diminish society's commitment to the proposition that the privacy rights of citizens must be protected against excessive governmental intrusion. A police officer's decision to seize an individual for investigatory purposes must be predicated on more than a "mere hunch."[3]
State v. Scully, 195 Conn. 668 (1985). Certainly, police are entitled to latitude when their experience and training lead them to the conclusion that an investigatory stop is appropriate. But the decision to make a stop must be based on reasonable and articulable facts which can withstand subsequent scrutiny.
In the final analysis, this court agrees with the view of Justice Glass that "in a close case . . . the balance ought to be struck on the side of the freedom of the citizen from governmental intrusion." Oquendo, supra, at 657. Conduct as innocuous as Mitchell's does not provide a reasonable and articulable basis for upholding an investigative stop.
Because the "seizure" of Mitchell was not properly supported, the items seized are all ordered suppressed. Because Mitchell's statement was the fruit of his arrest, it too CT Page 838 is ordered suppressed.
DOUGLAS S. LAVINE JUDGE, SUPERIOR COURT