**STATE of Delaware, Plaintiff Below, Appellant,**

v.

**Arthur ROLLINS, Defendant Below, Appellee.**

No. 362, 2006.

Supreme Court of Delaware.

Submitted: Nov. 15, 2006.
Decided: March 14, 2007.

Loren C. Meyers, Department of Justice, Wilmington, DE, for appellant.

Bernard J. O'Donnell and Raymond D. Armstrong (argued), Office of the Public Defender, Wilmington, DE, for appellee.

Before STEELE, Chief Justice, BERGER and RIDGELY, Justices.

STEELE, Chief Justice:

A New Castle County grand jury indicted the defendant-appellee Arthur Rollins, on the following charges: possession of cocaine with intent to deliver, distribution of cocaine within 1000 feet of a school, and possession of drug paraphernalia. Rollins filed a motion to suppress evidence police seized from his person claiming that the police did not have a reasonable articulable suspicion to detain and search him. The Superior Court held an evidentiary hearing on the motion. A Superior Court judge granted Rollins's motion to suppress. The state appeals the judgment suppressing the evidence and contends that the Superior Court judge erred in his application of the reasonable articulable suspicion standard to the facts. The State argues that the judge examined each factor in isolation when he should have considered the totality of the factual circumstances. After consideration of the record, we conclude that the officers had a reasonable articulable suspicion under the circumstances to stop Rollins; however, because the initial pat down or frisk revealed neither a weapon nor contraband on Rollins' person, we remand the case to the Superior Court to determine whether Rollins consented to the search of his pockets after the initial *Terry* pat down. If the judge on remand finds that Rollins did not consent to the search after the unsuccessful pat down or frisk, the evidence shall remain suppressed. If, on remand, the judge determines that Rollins knowingly and voluntarily consented to the search, the evidence seized is admissible. Accordingly, we reverse and remand.

## FACTS AND PROCEDURAL HISTORY

Officers Witt and Fossett were patrolling in a vehicle at approximately 1:20 p.m. on August 8, 2005 in the Riverside area of Wilmington. The officers knew that the

large courtyard near Riverside Apartment Projects bordered by East 26th and 27th Streets, Bowers Street, and Claymont Street was a high drug sales area. In order to surprise anyone in the courtyard engaging in drug transactions, they drove their vehicle over the curb and into the courtyard. There were a fairly large number of people there and one woman yelled "five-O"[1] in the direction of defendant-appellee Rollins. The officers then observed Rollins put his right hand in his pocket, then withdraw it and begin to walk away from them.[2] Witt drove the police car near Rollins and asked him to come over to the car. Fossett grabbed Rollins by the arm and brought him to the car because the officers believed that Rollins "looked like he was looking for a way out." The officers patted Rollins down for weapons but found none. According to the officers' testimony, Fossett asked Rollins "if he had anything that he wasn't supposed to," and Rollins said, "no." Fossett then asked Rollins if he could search his pockets; however, there is a dispute about whether Rollins agreed that the police could search his pockets.[3] Fossett then searched Rollins's pockets and found cocaine in the right front pocket of Rollins's trousers. The officers then arrested him.

In September 2005, a grand jury indicted Rollins on possession of cocaine with intent to deliver, distribution of cocaine within 1000 feet of a school, and possession of drug paraphernalia. The Superior Court held a suppression hearing on December 2, 2005. A Superior Court judge granted Rollins's motion and suppressed the State's proffered evidence because the police did not have a reasonable articulable suspicion to detain Rollins. Under 10 *Del. C.* § 9902,[4] the State certified that the suppressed evidence was essential for prosecution and asked for dismissal of the case. The trial judge dismissed the case on June 21, 2006. The State appealed.

## DISCUSSION

### Reasonable and Articulable Suspicion to Stop

■ When reviewing the findings and judgment after an evidentiary hearing on a motion to suppress, this Court will defer to the factual findings of a Superior Court judge unless those findings are clearly erroneous.[5] "Once the historical facts are established, the legal issue is whether an undisputed rule of law is violated. Accordingly, this Court reviews *de novo* whether police possessed reasonable articulable suspicion to stop a person."[6] After consideration of the record, we accept the Superior Court judge's interpretation of the facts. We review *de novo* his legal

1. This is a common phrase that is used to refer to police.

2. The facts up until this point are a summary of the Superior Court judge's recitation of the facts in his suppression hearing findings. The Superior Court judge then wrote, "The officers took the defendant into custody and on searching him discovered a baggy of cocaine in his pocket." He did not make any other factual findings. We must resort to the record and the parties' briefs for the facts that follow.

3. Rollins testified at his suppression hearing that he did not consent to the search but the officers testified that he did consent. The Superior Court judge never reached the issue of consent because he found that the police did not have a reasonable suspicion to stop Rollins in the first place.

4. 10 *Del. C.* § 9902.

5. *Riley v. State*, 892 A.2d 370, 373 (Del.2006) (citing *Woody v. State*, 765 A.2d 1257, 1261 (Del.2001)).

6. *Id.* (citing *Purnell v. State*, 832 A.2d 714, 719 (Del.2003)).

conclusion that the police did not have a reasonable articulable suspicion to stop or detain Rollins.

On appeal, the State contends that the Superior Court judge erred when he granted Rollins's motion to suppress because the police did have a reasonable articulable suspicion to stop Rollins. The State contends that the trial judge erred in his evaluation of the police officers' assessment of the reasonable articulable suspicion standard because he considered each fact in isolation rather than looking at the totality of the circumstances.[7]

 As we address the State's contentions, we must first determine when the police actually detained Rollins. "Then we must determine whether the officers had reasonable and articulable suspicion at that time to make the stop."[8] "A stop occurs when a police officer displays conduct that would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'"[9] "Under the Fourth Amendment to the United States Constitution, a seizure requires either physical force or submission to assertion of authority."[10] Here, it is apparent that the police seized Rollins when they approached him in the courtyard and used physical force to grab him and bring him to their car. Under those circumstances, a reasonable person would not believe that he was free to leave. Therefore, this is the point in time when the detention occurred.

 We must next determine whether the officers had a reasonable articulable suspicion to stop, detain and frisk him. "The Fourth Amendment of the United States Constitution protects individuals from 'unreasonable searches and seizures.'"[11] "In *Terry v. Ohio*, the United States Supreme Court held that a police officer may 'detain an individual for investigatory purposes for a limited scope and duration, but only if such detention is supported by a reasonable and articulable suspicion of criminal activity.'"[12] The stop is only justified, however, if "specific and articulable facts ... together with rational inferences" suggest that a suspect is involved in criminal activity.[13]

11 *Del. C.* § 1902 codifies the *Terry* principles:

Questioning and detaining suspects.

(a) A peace officer may stop any person abroad, or in a public place, who the officer has a *reasonable ground to suspect* is committing, has committed or is about to commit a crime, and may demand the person's name, address, business abroad and destination.

(b) Any person so questioned who fails to identify himself or explain his actions to the satisfaction of the officer may be

7. In support of their position, the State cites *United States v. Arvizu*, 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) where the Supreme Court reversed a Court of Appeals decision regarding the reasonable and articulate suspicion standard because the lower court looked at each factor in isolation rather than considering the totality of the circumstances.

8. *Purnell*, 832 A.2d at 719.

9. *Jones v. State*, 745 A.2d 856, 862 (Del.1999) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988)).

10. *Purnell*, 832 A.2d at 719 (*citing California v. Hodari D.* 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)).

11. *Riley*, 892 A.2d at 373. *See* U.S. Const. amend. IV; *Jones v. State*, 745 A.2d at 860.

12. *Jones*, 745 A.2d at 861 (quoting *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, (1968)).

13. *Riley*, 892 A.2d at 373–374, quoting *Terry*, 392 U.S. at 20–21, 88 S.Ct. 1868.

detained and further questioned and investigated.

(c) The total period of detention provided for by this section shall not exceed 2 hours. The detention is not an arrest and shall not be recorded as an arrest in any official record. At the end of the detention the person so detained shall be released or arrested and charged with a crime.[14]

■ This Court has interpreted the words "reasonable ground" in the Delaware statute to be equivalent to the "reasonable and articulable" standard in *Terry*.[15] The officer must be able to point to specific facts, which viewed in their entirety and accompanied by rational inferences, support the suspicion that the person sought to be detained was in the process of violating the law in order to satisfy the "reasonable and articulable" standard.[16] The United States Supreme Court has made it clear that courts should evaluate the reasonable articulable suspicion standard under the totality of the circumstances, rather than examining each factor in isolation.[17] Both the U.S. Supreme Court and this Court have recognized that "[i]n some instances ... lawful and apparently innocent conduct may add up to reasonable suspicion if the detaining officer articulates 'concrete reasons for such an interpretation.'"[18] "The totality of the

circumstances, as viewed through the eyes of a reasonable, trained officer in the same or similar circumstances, must be examined by both the trial judge and appellate court to determine if reasonable suspicion has been properly formulated."[19]

˙ The State has identified several factors that, when considered together, the State believes justify the *Terry* stop. The police were patrolling in an area that was well known for drug sales. As the police entered the courtyard in their patrol car, a woman shouted a warning that police were nearby in Rollins's direction. This prompted Rollins to look up, turn away, and quickly insert and remove his hand from his pocket. He then began to walk away from the officers. We must consider the totality of those factors in order to determine whether the police had a reasonable articulable suspicion that Rollins was engaged in criminal action in order to detain Rollins.

The first factor to consider is that the neighborhood was well known as a high drug area. Officer Witt testified that based on his 11 years of experience and approximately 350 drug arrests, he knew the courtyard to be a location for drug sales. He testified that the courtyard is an ideal place for drug sales because there drug dealers can easily see the police approach and the courtyard presents multi-

---

**14.** 11 *Del. C.* § 1902 (emphasis added). *See also* 11 *Del. C.* § 1903:

> Searching questioned person for weapon. A peace officer may search for a dangerous weapon any person whom the officer has stopped or detained to question as provided in § 1902 of this title, whenever the officer has reasonable ground to believe that the officer is in danger if the person possesses a dangerous weapon. If the officer finds a weapon, the officer may take and keep it until the completion of the questioning, when the officer shall either return it or arrest the person. The arrest may be for the illegal possession of the weapon.

**15.** *Riley,* 892 A.2d at 374, citing *Jones,* 745 A.2d at 861.

**16.** *Id.* citing *Downs v. State,* 570 A.2d 1142, 1145 (Del.1990).

**17.** *See e.g. United States v. Arvizu,* 534 U.S. 266, 274, 122 S.Ct. 744, 151 L.Ed.2d 740, (2002).

**18.** *Riley,* 892 A.2d at 375 (quoting *Harris v. State,* 806 A.2d 119, 121 (Del.2002)).

**19.** *Id.* at 374, citing *Jones,* 745 A.2d at 861.

ple avenues of escape. In *Wardlow*, the United States Supreme Court noted, "[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation."[20] In *United States v. Johnson*, the Court considered a high crime area to be a factor in its reasonable suspicion analysis. Following *Wardlow*, the Court in *Johnson* noted, "While obviously insufficient by itself to amount to reasonable suspicion, the 'fact that the stop occurred in a high crime area is among the relevant contextual considerations in a Terry analysis.'"[21]

Next, we will consider the bystander's warning shout of "five-O"[22] directed to Rollins. The Appellate Court of Connecticut, in *State v. Williamson*, considered a police warning as a factor in analyzing whether the police had reasonable articulable suspicion to stop a defendant.[23] In *Williamson*, the officer "observed that, upon his and other officers approach on the night of the incident, the defendant, after hearing someone yell 'police' or some other word of alert, began running ..."

The Court noted that "[w]hile the police had no more than a generalized suspicion of illegal contact when they approached the [site of the incident], that suspicion became specific and focused on the defendant when he ran into the restaurant in response to the warnings that police had arrived."[24] We likewise conclude that the focused warning shout "five-O" contributed to the police officers' reasonable suspicion that Rollins might be engaged in criminal activity.

Next we will consider Rollins's insertion and removal of his hand in his pocket when he saw the officers approaching. In *United States v. Johnson*, police observed a parked car with two passengers in a high narcotics area. The officers saw a young woman lean into the passenger's window and hand Johnson an object that they could not identify. As the police approached the vehicle, the woman walked away. One officer saw Johnson make a "shoving down motion."[25] The court noted that Johnson's "furtive gestures after the officer's display of authority contributed to the officer's reasonable suspicion."[26]

**20.** *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000).

**21.** *United States v. Johnson*, 212 F.3d 1313, 1316 (2000) (quoting *Illinois v. Wardlow*, 528 U.S. at 124, 120 S.Ct. 673) (*See also Adams v. Williams*, 407 U.S. 143, 144, 147–148, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)).

**22.** *See State v. Williamson*, 10 Conn.App. 532, 524 A.2d 655, 656 (1987); *Johnson v. State*, 604 A.2d 417, 1991 WL 279843 at *1 (Del.) (Order) ("As [the officers] neared the courtyard, the officers heard people in the distance shouting, "five-o", a phrase commonly used to notify others that police are nearby." Coincidentally the events of the present case took place in the same courtyard as in *Johnson*.); *Dendy v. State*, 571 A.2d 786 at n. 2 (Del.1989) (Order) ("This is a type of common "street" warning, used particularly in areas where drug sales are in progress, to signal the presence, or suspected presence, of police. It is derived from the name of a popular television police-action series known as 'Hawaii Five-O.'" In *Dendy*, this Court considered a lookout yelling "five-O" to be a relevant factor in its review of a probable cause determination, particularly since the statement was directed at the appellant.).

**23.** *Williamson*, 524 A.2d at 658.

**24.** *Id.* at 660.

**25.** *Johnson*, 212 F.3d at 1315. In *Johnson*, the police testified that they believed that Johnson may have been retrieving or hiding a gun in his pocket. *Id.* at 1317.

**26.** *Riley*, 892 A.2d at 377 (*citing Johnson*, 212 F.3d at 1316).

Rollins furtive gestures can similarly be considered for the purpose of determining reasonable articulable suspicion.

The final factor is that Rollins walked away from the officers.[27] As this Court noted in *Cummings v. State*, "merely leaving the scene upon the approach, or the sighting, of a police officer is not, in itself and standing alone, suspicious conduct," however, it may be considered as a factor in the totality of the circumstances.[28] Although Rollins walked away as the officers approached him rather than run away, he nevertheless appeared to be intent on evading the police after the woman gave him a warning that police were in the area.

Although it is possible that each factor, in isolation, could indicate seemingly innocent behavior, when we examine these facts under the totality of the circumstances, we find that the police had a reasonable articulable suspicion that Rollins may be engaged in criminal activity. They were, therefore, justified in detaining him and conducting a *Terry* pat down or frisk for their own protection.

## Scope of the Terry Stop

We will next consider whether the officers' conduct exceeded the scope of a proper *Terry* detention. During a *Terry* "stop," an officer "may conduct a limited protective search for concealed weapons."[29] "So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose."[30] This search for weapons is limited, and "if the search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed."[31]

In *Purnell v. State*, officers stopped Purnell because he fit the description of a suspect.[32] As Purnell walked out of a restaurant, three officers approached him, identified themselves, escorted him to their unmarked car, and told him they were investigating a complaint regarding handguns and narcotics.[33] The detectives asked Purnell if they could speak with him, and he agreed. The police then asked if they could pat him down for weapons, and

27. *See Wardlow*, 528 U.S. at 124–25, 120 S.Ct. 673.

28. *Cummings v. State*, 765 A.2d 945, 949 (Del. 2001); *See also Jones*, 745 A.2d at 861 ("We assume arguendo, but need not decide, that if a person attempts to flee before being seized, the court may consider the attempt to flee, and any information derived therefrom, as one factor in deciding whether a police officer had an articulable basis for effecting the seizure."); *U.S. v. Sharpe*, 470 U.S. 675, 683 n. 3, 105 S.Ct. 1568, 84 L.Ed.2d 605 (suspect vehicles took evasive action and started speeding as soon as marked car began to follow.); People v. *Souza*, 9 Cal.4th 224, 36 Cal.Rptr.2d 569, 885 P.2d 982, 988 (1994) ("There is an appreciable difference between declining to answer a police officer's questions during a street encounter fleeing at the first sight of a uniformed police officer. Because the latter shows not only unwillingness

to partake in questioning but also unwillingness to be observed and possibly identified, it is a much stronger indicator of consciousness of guilt.") (citing *Florida v. Royer*, 460 U.S. 491, 498, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)).

29. *Purnell*, 832 A.2d at 720 (*quoting Adams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)).

30. *Id.* (*citing Adams*, 407 U.S. at 146, 92 S.Ct. 1921).

31. *Id.* (*citing Hicks v. State*, 631 A.2d 6, 11 (Del.1993); *Minnesota v. Dickerson*, 508 U.S. 366, 373, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993)).

32. *Id.* at 716.

33. *Id.* at 717.

he again agreed.[31] One of the officers conducted the pat down but found no weapons.[35] The officer did, however, detect a large bulge in Purnell's right pants pocket.[36] When asked what the bulge was, Purnell stated it was approximately $300 in cash that he had earned from a temporary job.[37] Purnell then gave consent for the detective to remove the money from his pocket.[38]

After the search, the officers asked Purnell to provide identification and state his business abroad.[39] Purnell produced valid identification and told the detectives that he was visiting his grandmother.[40] He then pointed down the street to a house the police believed to be vacant.[41] The officers also asked Purnell how he had traveled to his grandmother's house, and he said that he had taken the bus.[42] This aroused the detectives' suspicions, however, because during the pat down the officer felt what he believed to be a remote control automobile keypad in Purnell's jacket.[43] The officers then searched Purnell a second time and removed the keypad from his jacket. Purnell told the officers that the keys belonged to his grandfather's Buick which he had permission to drive.[44] There was a black Buick parked on the street near the house where Purnell had pointed. The detectives asked Purnell if the car was his or his grandfather's, and he stated that it was neither his nor his grandfather's. The officers then walked toward the car and pressed the keypad they had taken from Purnell.[45] The doors of the car unlocked and they ran a license plate check of the vehicle and found that it was registered to Purnell.[46] After a K9 unit alerted the officers to the presence of drugs in the car, they arrested Purnell.[47] In *Purnell,* this Court considered the validity of the second search following the lawful *Terry* stop and frisk which revealed no weapons.[48] The record showed that the purpose of the additional search was not to protect the officers, but to gather evidence.[49] The Superior Court denied Purnell's motion to suppress the fruit of the second search. This Court reversed and held that the second search violated Purnell's Fourth Amendment right to be protected from unreasonable searches and seizures, and any evidence gathered pursuant to this second search should have been suppressed as fruit of the poisonous tree.[50] This Court stated, "The officers did not have the authority to conduct this second search because the first search revealed that Purnell did not have any weapons. Thus, the second search was not for the purpose of protecting the officers."[51]

34. *Id.*

35. *Id.*

36. *Id.*

37. *Id.*

38. *Id.*

39. *Id.*

40. *Id.*

41. *Id.*

42. *Id.*

43. *Id.*

44. *Id.*

45. *Id.*

46. *Id.* at 718.

47. *Id.*

48. *Id.* at 721.

49. *Id.* at 723.

50. *Id.*

51. *Id.*

*Hicks v. State*,[52] is another case where this Court found that police action exceeded the permissible scope of a Terry stop. A uniformed police officer, while patrolling in Frankford, Delaware, notice a Chevette stopped in the middle of the street, in violation of 21 Del.C. § 4178(a).[53] The officer then approached the driver, Monica Collins, and asked for her license and registration.[54] During the investigation, the officer noticed that Hicks and a few others come closer, and the "officer began to feel uneasy about the growth of the crowd and Hicks' apparent interest in his investigation."[55] The officer asked Hicks his purpose abroad, and Hicks in turn asked the officer to explain what he was doing.[56] The officer became increasingly concerned when he noticed Hicks was keeping his hands in his pockets, and could be concealing a weapon.[57] Next, the officer asked Hicks to leave the area so that he could complete his investigation.[58] Hicks refused, and the officer decided to detain Hicks to identify him.[59] The officer ran a computer check on Hicks and decided to do a pat down for weapons. During the pat down, he felt a hard object in Hicks' pocket.[60] The officer removed a green pouch from Hicks' pocket. Hicks told the officer that the pouch contained his grandmother's money. The officer did not believe Hicks and opened the bag and found money and a sandwich bag.[61] Before continuing his search, however, the officer placed Hicks in his police car,[62] reexamined the bag, found nearly $1,800 in cash and what was later verified to be 6.48 grams of crack cocaine.[63]

This Court concluded that "although Hicks' menacing conduct justified his initial detention, the officer's decision to reexamine the contents of the pouch without articulating any reasonable basis to believe it contained a weapon exceeded the permissible scope of the safety search authorized under 11 *Del. C.* § 1903 and *Terry v. Ohio.*"[64]

In both *Purnell* and *Hicks,* the sole purpose of the officers' second search was to obtain evidence after they had not found any indication of criminal activity as a result of a *Terry* pat down.

■ Here, a similar situation occurred when the police patted Rollins down and did not find any indication of criminal activity. Then the police directly entered and searched Rollins' right pocket (the same pocket into which Rollins had inserted his hand earlier when police approached him in the courtyard). Their purpose was to obtain evidence. It is manifestly clear that the officers' interest in a more extensive search did not relate to protecting themselves. That said, the issue here is the import of the conversation between Rollins and the police after the *Terry* pat down. In the suppression hearing, it was not necessary for the Superior Court judge to determine whether Rollins consented to

---

52. 631 A.2d at 7.

53. *Id.*

54. *Id.*

55. *Id.* at 8.

56. *Id.*

57. *Id.*

58. *Id.*

59. *Id.*

60. *Id.*

61. *Id.*

62. *Id.*

63. *Id.*

64. *Id.* at 11–12.

the second search because he found that the police did not have a reasonable articulable suspicion to stop Rollins and, therefore, had no need to explore whether Rollins voluntarily consented to a police probe directly into his pockets. While we hold that there was a reasonable articulable suspicion for the initial Terry stop, we nevertheless believe that the Superior Court must first decide whether Rollins voluntarily consented to an incursion into his pockets in order to determine whether the evidence seized as a result of that direct entry into his pockets should be admitted or suppressed. Therefore, we remand to the Superior Court with the following instructions: The Superior Court judge should find as a matter of fact whether Rollins voluntarily and knowingly consented to the officers' direct search of his pockets following the uneventful *Terry* stop and frisk.

## CONCLUSION

For the foregoing reasons, the judgment of the Superior Court is REVERSED and REMANDED.