IN THE SUPREME COURT OF THE STATE OF DELAWARE

<table>
<tr><td>STATE OF DELAWARE,</td><td>§</td><td></td></tr>
<tr><td></td><td>§</td><td>No.   414, 2018</td></tr>
<tr><td>Plaintiff Below,</td><td>§</td><td></td></tr>
<tr><td>Appellant,</td><td>§</td><td>Court Below:   Superior Court</td></tr>
<tr><td></td><td>§</td><td>of the State of Delaware</td></tr>
<tr><td>v.</td><td>§</td><td></td></tr>
<tr><td></td><td>§</td><td>I.D. No. 1710007866 (N)</td></tr>
<tr><td>ANDRE MURRAY,</td><td>§</td><td></td></tr>
<tr><td></td><td>§</td><td></td></tr>
<tr><td>Defendant Below,</td><td>§</td><td></td></tr>
<tr><td>Appellee.</td><td>§</td><td></td></tr>
</table>

Submitted:   April 24, 2019
Decided:   July 10, 2019

Before **STRINE**, Chief Justice; **VALIHURA**, **VAUGHN**, **SEITZ**, and **TRAYNOR**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court.   **REVERSED and REMANDED**.

Martin B. O'Connor, Esquire (*argued*), Deputy Attorney General, Wilmington, Delaware, for Appellant, State of Delaware.

Nicole M. Walker, Esquire (*argued*), Assistant Public Defender, Wilmington, Delaware, for Appellee, Andre Murray.

**VAUGHN**, Justice, for the Majority:

## I.   INTRODUCTION

This is an appeal by the State from a Superior Court order that granted Andre Murray's motion to suppress evidence in a criminal proceeding.   In the late evening hours of October 13, 2017, Wilmington Police Officer Matthew Rosaio was on patrol with other officers when he observed two men walking on a nearby sidewalk. One of the men, Murray, was walking with his right arm canted and pinned against the right side of his body, specifically the right front portion of his body.   The other man, Lenwood Murray-Stokes, was walking normally.   The manner in which Murray was walking made Officer Rosaio suspicious that Murray was carrying a concealed firearm in his waistband on his right side.   After watching Murray for about 20 seconds, during which Murray continued to walk in that same manner, Officer Rosaio approached the two men.   Murray then began positioning himself behind Murray-Stokes, turning and blading his right side away from the officer. This furthered the officer's suspicion that Murray possessed a firearm.   The officer began drawing his weapon and instructed Murray to show his hands.   Murray appeared to reach for his waistband area.   The officer then pointed his weapon at Murray and instructed him to not reach for his waistband and to get on the ground. Murray complied.   The officer then asked Murray whether he had anything in his

possession. Murray replied that he had a firearm in his waistband. The officer located the firearm in Murray's waistband on his right side and seized it.

Murray was charged with Carrying a Concealed Deadly Weapon, Possession of a Firearm by a Person Prohibited, and Possession of Ammunition by a Person Prohibited. He filed a motion to suppress the discovery of the firearm from use as evidence at trial, arguing that the officer did not have a reasonable, articulable suspicion that Murray had committed or was about to engage in any illegal activity to justify detaining him or probable cause to arrest him. The Superior Court agreed and granted the motion to suppress. For the reasons that follow, we conclude that the officer performed a legitimate *Terry* stop[1] and therefore the motion should have been denied.

## II. FACTS AND PROCEDURAL HISTORY

The factual record consists of the unrebutted testimony of Officer Rosaio, the sole witness at the suppression hearing. He testified that on October 13, 2017, at approximately 11:00 p.m., he and three other officers were "conducting proactive mobile patrol" in Wilmington.[2] They were traveling northbound on South Franklin Street in an unmarked vehicle when they stopped at a stop sign at the corner of South Franklin and Chestnut Street—a neighborhood described by Officer Rosaio as a

---

[1] *Terry v. Ohio*, 392 U.S. 1 (1968).
[2] App. to Appellant's Opening Br. at A28, A25-28.

3

"well-known high crime, high drug area," where he has made numerous gun- and drug-related arrests.[3]

While stopped at the stop sign, Officer Rosaio saw two men, later determined to be Andre Murray and Lenwood Murray-Stokes, walking on the sidewalk along South Franklin towards their vehicle. Officer Rosaio observed Murray swinging his left arm naturally while holding his right arm close to his body, behavior which he explained was consistent with an armed individual. He "noticed right away . . . that Mr. Murray was walking with his right arm canted and pinned against the right side of his body, specifically the right front portion of his body, which is one of the telltale signs of . . . somebody who is armed with a handgun."[4] This is a sign that someone is armed, he explained, because "[s]ubjects will often carry firearms in their waistband unsecured by any type of holster and in a way that they can control that firearm and adjust it, if need be, as they are walking so it doesn't fall down through their pants or so it doesn't reveal itself to the public."[5]

---

[3] *Id.* at A28.

[4] *Id.* at A31.

[5] *Id.* at A31-32. This Court has encountered the concept of "canting" before. In *Lum v. State*, Officer Rosaio described canting as "when a subject either instinctively or nervously adjusts a firearm in their waistband, and their arm goes up and holds it tight against the body. It's almost like a 90-degree motion you make with your arm." 193 A.3d 733, 2018 WL 4039898, at *1 n.2 (Del. Aug. 22, 2018) (Table) (alterations and omissions omitted) (quoting Suppression Hearing Tr.).

Officer Rosaio continued to watch him for "about 20 seconds" as the two men continued walking toward the officers' vehicle.[6] As they got closer, Murray appeared to notice the officers and took a "stutter step, where he kind of stopped in his tracks."[7] Continuing to walk forward at a slower pace, "he looked forward and then scanned and looked back."[8] Then Officer Rosaio, who was wearing a vest with "[p]olice" marked across it "in large white bold letters,"[9] exited the vehicle, "at which point Mr. Murray stopped and began positioning himself behind Lenwood Murray-Stokes."[10] At the same time, Murray began "turning and blading" the right side of his body, the side that he had his arm pinned against, away from Officer Rosaio.[11] Officer Rosaio testified that, from his training and experience, the "turning and blading" movement is a characteristic of someone "who's placing the side that the gun [is] on in a position where the police or the public can't see it."[12] It was an "unnatural movement" according to Officer Rosaio.[13]

By then confident that Murray had a handgun on his right side, Officer Rosaio began drawing his service firearm and ordered him to stop and show his hands. At

---

[6] App. to Appellant's Opening Br. at A33.
[7] *Id.* at A34.
[8] *Id.* at A34-35.
[9] *Id.* at A44.
[10] *Id.* at A36.
[11] *Id.*
[12] *Id.*
[13] *Id.*

that point, Murray "began reaching for the lower . . . waistband area."[14]  In response, Officer Rosaio raised his service revolver, pointed it in Murray's direction, and said, "[d]on't reach for your waistband.  Get on the ground."[15]  Murray complied and got on the ground.  When asked if he had anything on him, Murray replied, saying "I have a handgun in my waistband."[16]  Officer Rosaio then rolled him to his left side, revealing that a handgun was located on the "front right portion of his waistband."[17]  Officer Rosaio secured the handgun and placed Murray under arrest.

Officer Rosaio also testified that he has received training on characteristics of armed gunmen at the Wilmington Police Academy and at sessions hosted by the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives and the U.S. Department of Justice.  These characteristics include "things that people display when they are attempting to conceal firearms from the police and from the public."[18]  He also explained that for about the last four years he has taught elements of characteristics of armed gunmen in police academies.

---

[14] *Id.* at A37.
[15] *Id.* at A37-38.
[16] *Id.* at A38.
[17] *Id.*
[18] *Id.* at A27.

Following the hearing, the Superior Court granted the motion in a written opinion, which noted several reasons for its decision. First, the court found that although at some point the encounter was a *Terry* stop, once Officer Rosaio drew his firearm "an arrest was effectuated," thus requiring there to have been probable cause to believe that Murray was committing a crime.[19] Notwithstanding this finding, and perhaps given the way the parties' presented their arguments, the court's analysis was not clearly tied to either the reasonable, articulable suspicion standard for a *Terry* stop or the probable cause standard for an arrest.[20]

The court then discussed, and dismissed, the State's argument that the court should give deference to the officer's training and experience to determine whether the objective facts, paired with the officer's subjective interpretation of those facts, justified the intrusion. According to the court, the Stated relied "almost exclusively on two objective facts: 1) the defendant's swinging of one arm while holding the other close to his side and 2) his 'blading' or moving his body sideways when he and his walking partner stopped."[21] Although the court noted the other factors referenced by Officer Rosaio—"the high crime neighborhood, the apparent 'stutter step' and his 'looking around' as the officer was getting out of the car"—it dismissed

---

[19] *State v. Murray*, 2018 WL 1611268, at *1 (Del. Super. Apr. 2, 2018).
[20] *E.g.*, *id.* at *3 ("The handgun seized as a result of the *stop/arrest* of the defendant will be suppressed." (emphasis added)).
[21] *Id.* at *2.

these as "essentially chaff, thrown off by the essential facts that the officer advises his training and experience teach that the defendant was carrying a concealed weapon."[22]   In support of its rejection of Officer Rosaio's testimony, the court cited a number of hypothetical innocent explanations for why someone might walk with one arm held close to the body.

In addition, while the court noted that the rules of evidence do not apply to preliminary questions of fact governing admissibility, it determined that "the 'armed gunman' testimony in which we are asked to have faith is certainly not a 'lay opinion' under D.R.E. 701 as it is professed to be based on 'scientific, technical, or other specialized knowledge' and therefore, it is within the scope of D.R.E. 702."[23] "In order to qualify for admissibility under Rule 702," the court continued, "such testimony would necessarily be 'based on sufficient facts or data' and 'the product of reliable principles and methods' that have been 'reliably applied' to the facts."[24] Concluding that "[n]one of these criteria have been met here," the court explained that although "the officer had some sort of 'training,' it cannot be said to have qualified as 'science'—junk or otherwise.   On this record, the Court cannot assign it the weight it was obviously accorded by the officer on the night in question."[25]

---

[22] *Id.*
[23] *Id.* at *3.
[24] *Id.* (quoting D.R.E. 702).
[25] *Id.*

8

Following the court's grant of Murray's motion to suppress, the State moved for reargument, requesting that the court reconsider its ruling. In denying the State's motion, the court expanded on its earlier remarks, but its ultimate conclusion remained unchanged.[26] Although the court reiterated that the seizure of Murray was an arrest governed by the probable cause standard,[27] its analysis included references to both the probable cause standard and the lesser reasonable articulable suspicion standard required for an investigatory stop.[28]

The State argues on appeal that the Superior Court erred by finding that Murray's arrest without probable cause occurred when Officer Rosaio drew his firearm, before he located the firearm in Murray's waistband. Under the State's theory, Murray's detention was a *Terry* stop that did not become an arrest until after the firearm was found. The State also argues that under a *Terry*-stop analysis, the officer had a reasonable articulable suspicion that Murray was carrying a concealed deadly weapon. Murray opposes both arguments and argues that the Superior Court's reasoning and result were correct.

---

[26] *See State v. Murray*, 2018 WL 3629150, at *1 (Del. Super. July 26, 2018).
[27] *Id.* ("[T]he question was—and we suppose, remains—was there probable cause to point a gun at the suspect, order him to the ground, and take him into custody?").
[28] *See id.* at *2-4.

### III. DISCUSSION

"We review the grant or denial of a motion to suppress for an abuse of discretion."[29] Although "this Court will defer to the factual findings of a Superior Court judge unless those findings are clearly erroneous,"[30] "[e]mbedded legal conclusions are reviewed '*de novo* for errors in formulating or applying legal precepts.'"[31] Accordingly, we review *de novo* whether the police possessed reasonable, articulable suspicion to stop a person.[32]

We will first address the State's argument that the Superior Court erred by finding that an arrest lacking probable cause occurred before Murray's firearm was found in his waistband. Second, we will address whether the stop was justified under the appropriate standard.

### A.

There is a difference between an arrest and a *Terry* stop. "An arrest occurs when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest."[33] By contrast, a *Terry* stop or seizure occurs

---

[29] *Lopez-Vazquez v. State*, 956 A.2d 1280, 1285 (Del. 2008).
[30] *State v. Rollins*, 922 A.2d 379, 382 (Del. 2007).
[31] *Flowers v. State*, 195 A.3d 18, 23 (Del. 2018) (quoting *Lopez-Vazquez*, 956 A.2d at 1285).
[32] *Rollins*, 922 A.2d at 382.
[33] *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1017 (7th Cir. 2006) (internal quotation marks omitted).

10

when "under all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he/she was not free to terminate the encounter with the officers."[34]  For example, the United States Supreme Court has found that the line between a *Terry* stop and an arrest is crossed when the police "forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes."[35]

The Superior Court's ruling on arrest versus *Terry* stop is as follows:

> To be sure, there was perhaps a moment, as the officer was exiting his vehicle and before he drew his service revolver, where this was a "*Terry*" stop, requiring reasonable articulable suspicion that criminal activity is afoot and the subject is armed and dangerous.  But upon seeing the defendant turn his body, and before any "real" contact was made, the officer candidly testified that he was convinced the defendant was indeed armed and may be reaching for his pistol and thus, an arrest was effectuated which, as we all know, must be preceded by probable cause to believe a crime is being committed and the suspect committed it.[36]

---

[34] *Quarles v. State*, 696 A.2d 1334, 1336-37 (Del. 1997) (en banc) (citing *Florida v. Bostick*, 501 U.S. 429, 439 (1991)).   This Court expressly refused to adopt the stricter test, created in *California v. Hodari D.*, 499 U.S. 621, 626 (1991), for determining when a Fourth Amendment seizure has begun.  *See Jones v. State*, 745 A.2d 856, 863-64 (Del. 1999) (en banc) ("*Hodari D.* is not consistent with our view of when a person is 'seized' within the meaning of Article I, § 6 of the Delaware Constitution in that *Hodari D.* would allow a police officer lacking reasonable suspicion to create that suspicion through an unjustified attempted detention."); *id.* at 869 (holding that whether "a seizure has occurred under Article I, § 6 of the Delaware Constitution requires focusing upon the police officer's actions to determine when a reasonable person would have believed he or she was not free to ignore the police presence").

[35] *Hayes v. Florida*, 470 U.S. 811, 816 (1985).

[36] *Murray*, 2018 WL 1611268, at *1 (footnote omitted) (citing *Terry*, 392 U.S. at 30).

11

Our view is that an arrest did not occur until after the officer found the weapon in Murray's waistband. The officer testified that after Murray bladed his body, he was confident that Murray possessed a firearm, but that confidence remained a suspicion until Murray admitted he had a firearm, after which the officer immediately found the firearm on his person. It was only then that Officer Rosaio placed Murray into custody and an arrest occurred, at which point there was clear probable cause to believe that a crime was being committed—carrying a concealed deadly weapon.

In addition, Officer Rosaio's actions in drawing his weapon and forcing Murray to the ground at gunpoint did not convert the encounter into an arrest. Although "[a]n unreasonably intrusive stop may constitute a *de facto* arrest requiring probable cause," a "*Terry* stop does not turn into a full arrest merely because the officers use handcuffs and force the suspect to lie down to prevent flight, so long as the police conduct is reasonable."[37] "During a *Terry* stop, officers may take measures that are reasonably necessary to protect themselves and maintain the status quo."[38] Specifically, an officer is empowered "to take necessary measures to

---

[37] *Flowers*, 195 A.3d at 25 (internal quotation marks omitted).

[38] *Id.* at 28 (quoting *United States v. Goode*, 309 F. App'x 651, 654 (3d Cir. 2009)); *see also United States v. Hensley*, 469 U.S. 221, 235 (1985) ("When the Covington officers stopped Hensley, they were authorized to take such steps as were reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.").

determine whether [an individual] is in fact carrying a weapon and to neutralize the threat of physical harm" when the officer "is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous."[39]

Although Officer Rosario began drawing his weapon after Murray engaged in a blading movement, he testified that it was only after he saw what appeared to be Murray reaching for his waistband that he pointed his weapon at Murray and told him to get on the ground. These were reasonable defensive measures that the officer took for his own safety under the circumstances.[40]

Because Officer Rosaio was engaged in a *Terry* stop at the time he discovered the gun, the gun was lawfully seized provided the stop was supported by a reasonable, articulable suspicion that Murray was engaged in criminal activity, specifically, carrying a concealed deadly weapon.[41]

**B.**

The police may "'restrain an individual for a short period of time' to investigate where officers have 'reasonable articulable suspicion that the suspect has

---

[39] *Terry*, 392 U.S. at 24; *see also Flowers*, 195 A.3d at 28.

[40] *See Flowers*, 195 A.3d at 28-29 ("Generally, a show of force, including the use of drawn weapons, does not render an investigative stop unreasonable if the police determine that it is reasonably necessary to protect themselves and maintain the status quo. . . . Similarly, forcing a detainee to lie down to prevent flight might be justified under the circumstances." (internal quotation marks omitted)).

[41] *See, e.g.*, *id.* at 23-24 (citing *Terry*, 392 U.S. at 30-31).

13

committed or is about to commit a crime.'"[42]   Although reasonable, articulable

suspicion requires less than probable cause and "considerably less than

preponderance of the evidence,"[43] the officer "must be able to point to specific and

articulable facts which, taken together with rational inferences from those facts,

reasonably warrant that intrusion." [44]   "[A] vague hunch or feeling that the

defendant 'looked suspicious' will not do."[45]   "A determination that reasonable

suspicion exists, however, need not rule out the possibility of innocent conduct."[46]

To determine whether reasonable suspicion exists, courts "must examine the totality

of the circumstances surrounding the situation 'as viewed through the eyes of a

reasonable, trained police officer in the same or similar circumstances, combining

objective facts with such an officer's subjective interpretation of those facts.'"[47]

"In determining whether there was reasonable suspicion to justify a detention, the

court defers to the experience and training of law enforcement officers."[48]

Officer Rosaio was able to point to specific and articulable facts giving rise to

his suspicion that Murray was carrying a concealed deadly weapon.   These facts

---

[42] *Id.* at 24 (quoting *Quarles*, 696 A.2d at 1337).
[43] *Woody v. State*, 765 A.2d 1257, 1263 (Del. 2001) (en banc) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).
[44] *Terry*, 392 U.S. at 21.
[45] *Robertson v. State*, 596 A.2d 1345, 1350 (Del. 1991) (quoting *Brown v. Texas*, 443 U.S. 47, 52 (1979)).
[46] *United States v. Arvizu*, 534 U.S. 266, 277 (2002) (citing *Wardlow*, 528 U.S. at 125).
[47] *Woody*, 765 A.2d at 1263 (quoting *Jones*, 745 A.2d at 861).
[48] *Flowers*, 195 A.3d at 27 (quoting *Woody*, 765 A.2d at 1262).

included the high crime area, stutter-stepping, the unnatural canting and blading that the officer described as well as Murray scanning the area and looking back upon seeing the officer. A fair reading of the officer's testimony creates an inference that the occurrence of unusual canting and blading movements has risen to such a level that these movements are discussed in officer training as being indicators that a person is carrying a concealed weapon. The officer reasonably explained the process by which he combined the objective facts he observed with his subjective interpretation of those facts, based upon his training and experience, to arrive at a reasonable and articulable suspicion that Murray was carrying a concealed deadly weapon. Indeed, the fact that Officer Rosaio honed in on Murray and not his companion—who was, by Officer Rosaio's account, walking normally at the same time of night in the same high crime area—lends further support to Officer Rosaio's reasonable suspicion that Murray had a weapon. In other words, Officer Rosaio did not simply stop two people walking late at night in a high crime area indiscriminately; instead, he focused his attention specifically on one of them who engaged in behavior that was indicative of the possession of a deadly weapon.

We think the Superior Court failed to give due deference to the training and experience of the police officer. The court described the officer's suspicion as a

15

hunch and "bereft of any scientific support."[49]   It also asked a number of

unanswered questions:

> What percentage of armed gunmen walk swinging one arm but not the other?   What percentage of citizens who walk swinging one arm but not the other are armed gunmen?   How, if at all, do these percentages change based upon the time of day or the fact that it is a high crime neighborhood?   Similarly, in a police encounter with a citizen, what percentage of the citizens turn their bodies away from the policeman?   And of those that do, what percentage are hiding something?   And of those that are hiding something, what percentage of them are hiding firearms?[50]

In addition, the court stated, or at least suggested, that the officer's testimony was

not admissible under Delaware Rule of Evidence 702 because it was not "based on

sufficient facts or data" or "the product of reliable principles and methods."[51]

When an officer testifies about something he has learned through his police training

or through his police experience, however, a court cannot expect the testimony to be

supported by a statistical analysis or a scientific study where there is no evidence

that such an analysis or study exists.[52]   "[T]he determination of reasonable

suspicion must be based on commonsense judgments and inferences about human

---

[49] *Murray*, 2018 WL 1611268, at *3.

[50] *Id.*

[51] *Id.* (quoting D.R.E. 702).

[52] *See Wardlow*, 528 U.S. at 124-25 ("In reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists.").

behavior,"[53] and such a determination "need not rule out the possibility of innocent conduct."[54]

Our good friend in dissent contends that an officer who sees someone engaging in furtive, odd behavior indicative of carrying a weapon cannot make a stop unless the officer has a reasonable suspicion that the person does not have a license to carry. But, of course, if a person has a legal right to carry a concealed weapon, that person has no need to act like someone in possession of illegal contraband. If police officers are to help protect the public from gun violence, they must be able to make reasonable inferences from unusual, awkward behavior uncharacteristic of people who have a legal right to possess a gun.[55]

## IV.  CONCLUSION

For the foregoing reasons, the judgment of the Superior Court is reversed, and the case is remanded to the Superior Court for further proceedings consistent with this opinion.

---

[53] *Id.* at 125 (citing *United States v. Cortez*, 449 U.S. 411, 418 (1981)).

[54] *Arvizu*, 534 U.S. at 277 (citing *Wardlow*, 528 U.S. at 125).

[55] It has long been the law in Delaware that "[t]he burden is upon the defendant to establish that he had a license to carry a concealed deadly weapon." *Lively v. State*, 427 A.2d 882, 884 (Del. 1981) (quoting *Modesto v. State*, 258 A.2d 287, 288 (Del. Super. 1969)); *see also State v. Sockum*, 99 A. 833 (Del. Ct. Gen. Sess. 1917). Establishing that a person does not have a license to carry a concealed deadly weapon, therefore, is not an element of the offense that must be proved beyond a reasonable doubt by the prosecution. *Lively*, 427 A.2d at 844. Because the lack of a license is not an element of the offense, the presence or absence of a license need not, and should not, be considered in determining whether there was reasonable, articulable suspicion to stop the suspect.

17

**TRAYNOR**, Justice, dissenting:

This case requires us to balance the rights of our citizens to be "secure in their persons . . . against unreasonable searches and seizures"[56] against the difficult burden we entrust to law enforcement officers to keep those same citizens safe on our streets. As part of that balancing, our constitutional law tolerates certain warrantless seizures that are less intrusive than full-fledged arrests on a lower level of suspicion than we require for an arrest. Thus, an investigative detention requires the detaining officer to have a reasonable articulable suspicion that the person stopped is, or is about to be, engaged in criminal activity,[57] while a full-fledged arrest must be supported by probable cause. Here, I agree with the Majority that Rosaio, in the first instance—that is, when he first approached Murray—was in the process of detaining him for investigatory purposes and therefore the detention at issue is subject to the reasonable-articulable-suspicion standard. But because Rosaio's basis for detaining Murray did not, in my view, rise to the level of reasonable articulable suspicion that Murray was subject to seizure for violating the law, I would affirm the Superior Court's order suppressing the evidence Rosaio seized as a direct result of his encounter with Murray. Therefore, I respectfully dissent.

---

[56] U.S. CONST. amend. IV.
[57] *Terry v. Ohio*, 392 U.S. 1, 22 (1968).

18

I disagree with the Majority in two respects. First, I do not believe that on this record the trial judge was required to defer absolutely to Rosaio's testimony merely because he purported to ground it upon his "training and experience." Second, I question the constitutionality of Rosaio's seizure of Murray based on his suspicion that Murray was carrying a concealed weapon absent a legitimate suspicion that Murray was doing so unlawfully.

After hearing all that Rosaio had to say about his training in the "the characteristics of an armed gunman"[58] as it applied to the facts of this case, the Superior Court found his testimony wanting. This constituted, in the Majority's view, a "fail[ure] to give due deference to the training and experience of the police officer."[59] To be sure, we have recognized that, in this field, "we give due deference to an officer's experience and knowledge."[60] But where, as here, the officer's testimony is vague and fails to inspire confidence, I cannot say that the Superior Court's failure to give the officer's testimony as much weight as the Majority would give was an abuse of discretion.

To expand on this last point, there was scant evidence in the record about the extent and reliability of the training upon which Rosaio claims to have relied when he formed the belief that Murray unlawfully possessed a firearm. When asked at

---

[58] A26.
[59] Majority Op. at 14.
[60] *Robertson v. State*, 596 A.2d 1345, 1350–51 (Del. 1991).

19

the suppression hearing about what he learned during his "training on the characteristics of an armed gunman," Rosaio replied:

> I mean, everything. There's several characteristics involving people's behavior and the geographical locations that they are in. I mean, a lot of it is observations, and there are elements that -- certain things that people display when they are attempting to conceal firearms from the police and from the public. They're just things that we're aware of and that we can use as a tool.[61]

The Superior Court was skeptical of Rosaio's testimony,[62] and the Majority holds that the Superior Court's skepticism constituted error. According to the Majority, the Superior Court should have deferred to Rosaio and, in any case, should not have demanded that Rosaio's testimony "be supported by a statistical analysis or a scientific study where there is no evidence that such an analysis or study exists."[63] But I do not read the Superior Court's decision as hinging upon the absence of such analyses or studies. Rather, taken as a whole, the ruling below appears to be the product of the trial judge's legitimate testing of the prosecution's assertion "that the Courts are required to simply 'trust' the training and experience of a police officer to make findings as to the appropriate balance between individual

---

[61] A27.

[62] During the argument that followed Rosaio's suppression hearing testimony, the Superior Court remarked that it "didn't hear much about the training, except [that] he's trained." A51.

[63] Majority Op. at 15.

20

liberties and legitimate law enforcement."[64]   In my view, it was appropriate for the Superior Court to push back against this notion and within its discretion to conclude, based upon the totality of the circumstances, that Rosaio was not in fact acting upon reasonable articulable suspicion but rather only upon a mere hunch.

Rosaio also offered that his training and experience enabled him to use Murray's turning away from him as Rosaio exited his vehicle to infer Murray's possession of a concealed gun because Murray's turn shows that he was "someone who's placing the side that the gun was on in a position where the police or the public can't see it."[65]   But this assumes that the turning away is designed to conceal something and that the thing must have been an unlawfully concealed firearm or another illicit item.   In order to escape this fallacy, Rosaio should have—but did not—offer testimony showing why turning away is solely or at least substantially linked to illegal activity, such as unlawful concealed weapon possession, as opposed to lawful activity.

It is also significant that Murray was free to leave until Rosaio detained him. In light of that fact, the trial court's skeptical reaction to Rosaio's reliance on Murray's turning away from him was fully justified.   As the Court of Appeals of

---

[64] *State v. Murray*, 2018 WL 1611268, at \*2 (Del. Super. Apr. 2, 2018).   This comment appears to be in response to the prosecutor's argument that "in situations such as this, all the Court does is defer to the police officer."   A52.
[65] A36.

21

Wisconsin, when confronted with similar testimony, pondered:

> [H]ow does a person walk away from another as [the Defendant] had the right to do without turning his or her body to some degree? Calling a movement that would accompany *any* walking away "blading" adds nothing to the calculus but a false patina of objectivity.[66]

Likewise, Rosaio's description of how Murray's arms were positioned in relation to his body—the so-called "canting" motion—and the "stutter step" Murray took does little to persuade me that Murray had done anything to arouse a reasonable suspicion that would justify his detention. As the Majority points out, Murray was "walking late at night in a high crime area"[67] as Rosaio and his companions observed him from their unmarked lights-on Chevrolet Tahoe full-size sport utility vehicle. It does not strike me as inherently suspicious that anyone, including Murray, might react cautiously or defensively in such a situation.[68]

I also part with the Majority's conclusion that Murray's detention was justified because "Officer Rosaio was able to point to specific and articulable facts giving rise to his suspicion that Murray was carrying a concealed deadly weapon."[69] Because *Terry* stops are permissible only upon suspicion of criminal activity,

---

[66] *State v. Pugh*, 826 N.W. 2d 418, 424 (Wisc. App. 2012).

[67] Majority Op. at 14.

[68] *See* City of Cambridge, *Basic Street Safety Tips* ("If the person following you is in a car, turn and walk in the opposite direction."), available at https://web.archive.org/web/20170211070557/http://www2.cambridgema.gov/CityOfCambridge _Content/documents/street%20saftety.pdf.

[69] Majority Op. at 13.

implicit in this part of the Majority's analysis is the premise that carrying a concealed deadly weapon is forbidden by our criminal code and therefore constitutes "criminal activity," the reasonable suspicion of which justifies an investigative detention.

But carrying a concealed deadly weapon is not in and of itself against the law. The Delaware statute that prohibits carrying a concealed deadly weapon, 11 *Del. C.* § 1442, provides that:

> A person is guilty of carrying a concealed deadly weapon when the person carries concealed a deadly weapon upon or about the person without a license to do so as provided by § 1441 of this title.

As I read this statute, the absence of a license is an element of the offense that the State would be required to prove beyond a reasonable doubt in a prosecution under § 1442. It follows then that a police officer's suspicion that a citizen is *unlawfully* carrying a concealed deadly weapon would depend in part on the officer's ability to articulate the reason or reasons why he believed that the citizen was unlicensed.

A very recent Pennsylvania Supreme Court opinion is instructive on this point. In *Commonwealth v. Hicks*,[70] the court rejected the notion that a police officer may infer criminal activity merely from an individual's possession of a concealed firearm in public. As the *Hicks* court wrote:

> We find no justification for the notion that a police officer may infer criminal activity merely from an individual's

---

[70] ---A.3d---, 2019 WL 2305953 (Pa. May 31, 2019); *see also United States v. Ubiles*, 224 F.3d 213, 218 (3d Cir. 2000), *as amended* (Sept. 28, 2000).

23

possession of a concealed firearm in public. . . . *Although the carrying of a concealed firearm is unlawful for a person statutorily prohibited from firearm ownership or for a person not licensed to do so, there is no way to ascertain an individual's licensing status, or status as a prohibited person, merely by his outward appearance. As a matter of law and common sense, a police officer observing an unknown individual can no more identify whether that individual has a license in his wallet than discern whether he is a criminal.* Unless a police officer has prior knowledge that a specific individual is not permitted to carry a concealed firearm, and absent articulable facts supporting reasonable suspicion that a firearm is being used or intended to be used in a criminal manner, there simply is no justification for the conclusion that the mere possession of a firearm, where it lawfully may be carried, is alone suggestive of criminal activity.[71]

Admittedly, my objection based on the Pennsylvania Supreme Court's reasoning in *Hicks* is problematic; after all, Murray did not make this argument in the trial court or before us. Besides that, contrary to my understanding that the absence of a license is an element of our carrying-a-concealed-deadly-weapon statute, we held in *Upshur v. State* that licensure is not an element but rather an affirmative defense.[72] But if I am correct—and I dissent only because I humbly

---

[71] *Hicks*, 2019 WL 2305953, at *14 (internal footnotes and citations omitted) (emphasis added).

[72] *Upshur v. State,* 420 A.2d 165, 169 (Del. 1980); *see also Lively v. State*, 427 A.2d 882, 884 (Del. 1981). The cases cited by the Majority that place the burden of proving licensure on the defendant trace their lineage back to the trial court's opinion in *State v. Sockum*, 99 A. 833 (Del. Ct. Gen. Sess. 1917). But *Sockum* was decided prior to the enactment of the modern Delaware Criminal Code, which abolished common law crimes. 11 *Del. C.* § 202. Moreover, the *Sockum* opinion does not even attempt to articulate a rationale for its holding. For these reasons, I am not satisfied that *Sockum* and its progeny should govern our interpretation of 11 *Del. C.* § 1442.

believe that I am—Murray's failure to raise the issue should not stop us from vindicating his Fourth Amendment rights.[73]

And I respectfully suggest that we should reconsider *Upshur*. *Upshur* involved, among other things, a prosecution for carrying a concealed deadly weapon of 11 *Del. C.* § 1442. On appeal, Upshur argued that the State had failed to meet its burden of proof that he did not have a license to carry the concealed weapon. In a one-sentence ruling, we rejected Upshur's claim, stating that he had "ignore[d] the clear import of 11 *Del. C.* § 305, which places the burden of proving that he was legally entitled to carry to deadly weapon (by virtue of a license) on the defendant."[74] 11 *Del. C.* § 305 provides that:

> [w]hen this Criminal Code or another statute specifically exempts a person or activity from the scope of its application and the defendant contends that the defendant is legally entitled to be exempted thereby, the burden is on the defendant to prove, as an affirmative defense, facts necessary to bring the defendant within the exemption.

But § 1442's licensure requirement is not an "exemption" within the meaning of § 305.[75] This conclusion is supported by the 1973 Commentary to the Delaware

---

[73] As *Hicks* itself notes, some courts have analyzed the question of whether suspicion of mere possession of a concealed weapon will justify a *Terry* stop with reference to whether licensure serves as an affirmative defense, in which case a *Terry* stop is deemed lawful. *Hicks*, 2019 WL 2305953, at *13.

[74] *Upshur*, 420 A.2d at 169.

[75] *Cf. Delaware v. Prouse*, 440 U.S. 648 (1979) (holding that that "except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure

Criminal Code, which contains an appendix (Appendix E) that lists the statutory exemptions referred to in § 305. 11 *Del. C.* § 1442 is not on the list of exemptions, and, moreover, is dissimilar in phrasing to the exemptions that are listed.[76] Put simply, licensure should not be considered an affirmative defense to a charge of carrying a concealed deadly weapon; rather, its lack should be considered an element of the offense.

For all these reasons, I would affirm the judgment of the Superior Court.

---

for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment"); 21 *Del. C.* § 2701(a) ("No person shall drive a motor vehicle on a public street or highway of this State without first having been licensed . . . ."); 24 *Del. C.* § 1766(a) (criminalizing practicing medicine without a license).

[76] *Compare* 11 *Del. C.* § 1442 *to* 11 *Del. C.* §§ 1321, 1325, 1335(6), 1403, 1408, 1444, and 1445. *See also* 11 *Del. C.* § 780B(b) (exemption for doctors and officers who have sexual contact with a person in custody where the doctor or officer was acting in the course of their duties); 11 *Del. C.* § 910 (exemption for debt adjustments incurred incidentally to the practice of law); 11 *Del. C.* § 1327 (exemption to Maintaining a Dangerous Animal for law enforcement and licensed private security agencies); 11 *Del. C.* § 1405(b) (exemptions to Possessing a Gambling Device).